[No. A011075. First Dist., Div. Two. Nov. 19, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
PETER F. WARREN, Defendant and Appellant.

964

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Phillip M. Brooks, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Herbert F. Wilkinson and Donna B. Chew, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KLINE, P. J.—

### INTRODUCTION

Peter F. Warren appeals his conviction following jury trial of unlawful taking of a vehicle. (Veh. Code, § 10851.) His principal contention, advanced under the Sixth Amendment, is that the court and prosecutor induced his primary witness to decline to testify by the intimidating manner in which they admonished that witness of his rights against self-incrimination.

### FACTS

*The Prosecution's Case*

On September 18, 1980, Concord Police Officer Robert Beasley was patrolling in his marked car. About 1 a.m., while parked in a lighted parking lot, he saw a motorcycle driven by appellant traveling southbound on Meadow Lane. He noticed that a marked police unit was driving southbound about 60 to 100 feet ahead of the motorcycle, while a second marked unit passed the motorcycle going northbound. Immediately after the second unit passed appellant, appellant suddenly pulled off the road and parked the motorcycle on the sidewalk. Beasley pulled up about 10 to 20 feet behind appellant because he observed that the vehicle had no rear license plate or rear taillight. When the officer asked appellant for the registration of the vehicle and his driver's license, appellant could not produce the registration but did hand over his license. The license showed that appellant was not authorized to drive a motorcycle. Officer Beasley then asked appellant where he obtained the motorcycle and to whom it belonged. Appellant responded that it belonged to a friend named "Chris" but was vague as to any other particulars. Throughout the conversation appellant appeared nervous.

Beasley ran a vehicle check and determined the motorcycle had been stolen. He also ascertained that someone had tampered with its ignition. Appellant was arrested and transported to the police station. After he had been advised of his rights, appellant repeated that he borrowed the motorcycle from an otherwise unidentified person named "Chris" and that he would

not have done so if he had known that it was stolen. At the station he also mentioned his employer's name, Chris Connolly, but did not say whether this was the same Chris who gave him the motorcycle.

The motorcycle belonged to Randy Morris, who had parked it in his apartment carport about 3:30 p.m. on the day in question. By 4:15 p.m. the motorcycle was gone. Morris notified the police, giving them a description of the motorcycle. At trial, Morris testified that the key was not in the ignition at the time it was stolen. When he recovered the motorcycle, the ignition was "messed up", i.e., a steak knife was wedged in the ignition, the taillight, horn and license plates were missing, and there was paint sprayed on the fenders and the gas tank.

*The Defense*

At trial, appellant testified that on the evening before he was arrested he went to a friend's house to pick up a waterbed. When he arrived, the friend who owned the bed was not there. However, the other person who lived there, Chris Gamer, was home. Chris showed appellant a motorcycle and offered to let him ride it. According to appellant, the motorcycle started merely by pushing a button; he never noticed the steak knife inserted in the ignition. He also claimed he did not know the motorcycle was stolen, nor did he know Chris' last name. He sought to avoid the police because he knew that the motorcycle had no license plates or taillight and because he possessed some marijuana.

It was stipulated by counsel that of the four latent fingerprints lifted from the motorcycle, none was appellant's and one of the four was the left palm print of Christopher Gamer, apparently the friend named "Chris" to whom appellant referred when questioned by the police. It was further stipulated that the defense had subpoenaed Gamer but that, through no fault of the defense, Gamer refused to testify. Gamer invoked his Fifth Amendment privilege after being informed by the court and the prosecutor that his testimony could be used against him in a subsequent prosecution for the theft of the motorcycle.

Mrs. Stella Gonsalvez, appellant's former mother-in-law, testified that she had spoken with Gamer before he had been subpoenaed. Gamer had told her that he was going to come to court to tell the truth, which was that he, Gamer, had stolen the motorcycle and that appellant had nothing to do with it. Gamer said he was willing to testify because he was already in California Youth Authority, anyway. On cross-examination, Gonsalvez stated that although she knew about Gamer's involvement months before the trial, she never informed the district attorney.

At the outset of the defense the court convened in chambers with defense counsel and the prosecutor in order to conduct a voir dire examination of Chris Gamer, whom appellant was ready to call as a witness. Appellant contended that Gamer was his key witness and was expected to testify that it was he, not appellant, who had stolen the motorcycle and that appellant was in no way involved in the theft. At the voir dire examination of Gamer the following discussion took place:

"[The Court]: As just mentioned, we are trying the jury trial of People of the State of California, against Peter Warren.

"You have been brought here as a possible witness by the defendant, Mr. Warren, bot[h] by the District Attorney's Office.

"Now, we will go into a little detail, but any person, which obviously includes you, has the right not to ans[w]er questions if the answers to those questions incriminate them.

"Or get them in a position they are admitting a crime, admitting the breaking of the law.

"That's I guess on the street called taking the 5th, 5th Amendment to the Constit[u]tion.

"So, you have those same rights, namely, not to testify, not to admit any crime.

"On the other hand, if you know those rights, give them up, waive them, you can admit to anything in the world including murder, if you wish.

"Further, if you need any legal advice, concerning admitting or not admitting, you are entitled to be represented by an attorney.

"Now, I know, because I have your file, that you were sent to Y.A. and that you did have an attorney at that time, Mr. Egan, of the Public Defender's Office.

"I have not called him until I hear from you as to what your desires, your intentions rather, concerning testifying.

"Now, we are trying to give you all the advice we can before you make up your mind if in fact you haven't made it up.

"Mr. Yancey here is from the District Attorney's Office.

"He is the man who would probably be in charge of prosecuting you if in fact you admitted liability of some crime.

"I don't know that he would, nobody knows for sure what the District Attorney's Office would do, but I think you are entitled to know what is possible to be done.

"Mr. Yancey, you want a further—to further voir dire?

"MR. YANCEY: I would, Your Honor.

"V[OI]R DIRE EXAMINATION

"BY MR. YANCEY: Q. Mr. Gamer, as the Judge said, I am Yancey, and I am the prosecutor.

"I am going to tell you that what we are here on is that Mr. Warren is charged with driving, violation of the Vehicle Code Section 10851, taking or driving a motorcycle, a Harley Davidson, that was taken from the owner back in September the 16th, 1980, and the evidence in the case is shown that he was picked up on that cycle on September the 18th, 1980.

"Now, he is on trial, and he said—and it's been brought out in testimony that—he borrowed it from a friend named Chris.

"By happenstance, your first name is Chris.

"A. Right.

"Q. Okay.

"We ran the fingerprints that were lifted from that bike, and I am going to show you a copy of a Concord Police Department fingerprint analysis, card marked gas tank, latent identified as having been made by Gamer's left palm.

"They ran the prints against your prints.

"Okay.

"Now, that is some evidence that you maybe are connected with this crime, and that is some evidence that I could use to charge you with this crime.

"As you know, the D.A.'s Office in this county is more likely to go ahead than not.

"Here is the situation you are in.

"You have the choice, you can tell the Court that you don't want to say anything about this crime, and no one—the Judge, me, or Mr. Willis—can make you say a thing about this crime, if you take the 5th Amendment.

"If you say I am not saying anything about the [c]rime, no matter who asks me, nobody can make you say a thing.

"But if you say I want to testify, once you start testifying, in front of that jury and I start asking you about these fingerprints on there and where you got it and who you got it from and all of the details of it, you got to keep answering.

"And I can use everything you say against you.

"A. Okay.

"Like, if I take the 5th, like you say, then you can keep me incarcerated, couldn't you, until, you know—

"Q. No. If you take the 5th, you go back to Y.A. right now.

"THE COURT: Taking the 5th doesn't mean a person is incarcerated.

"That's the privilege we all have including—I have that same privilege.

"If I want to take the 5th, if I am a witness, I can do so.

"What you may have in mind, by the last statement, is that if you started testifying, then Mr. Yancey started cross-examining you and asking you questions, then you say, woe [*sic*], I don't think I am going to talk anymore, Mr. Yancey, then I might be able to find you in contempt of court for refusing to answer questions after you had testified in mid-stream, in other words, saying I am not going to talk anymore.

"I might be able to keep you in jail for a few days for that.

"What is it, five days or until the end of the trial?

"MR. WILLIS: The end of the trial and then five days as possible punishment.

"THE COURT: That would—That [may be] what you are thinking of.

"I don't know.

"THE WITNESS: That's what I mean.

"THE COURT: But for taking the 5th and saying nothing that's again, repeating, but that's everybody's privilege and nobody gets incarcerated for that.

"Mr. Willis, did you want to get in on this or not?

"MR. WILLIS: Not at this point, your Honor.

"MR. YANCEY: If I can sum up, Your Honor.

"Q. You can testify or not. If you take the 5th right now, you go back to Y.A. and God bless you. If you start testifying, he asks you questions about this crime, I ask you questions about the crime, and we are going to use everything against you we have got—

"A. I am taking the 5th right now then.

"MR. YANCEY: I have no further questions."

At that point defense counsel requested that Gamer be granted immunity, which the district attorney refused to do. A defense motion that in lieu of such immunity the court dismiss the charges against appellant was denied.

■■■ ■■■ Appellant maintains he was denied his right to present a defense as his "key witness" was effectively driven off the witness stand "under the barrage of cautionary questioning" by both the trial judge and the prosecutor.[1]

---

[1]This issue may now be raised on appeal despite the fact that defense counsel made no explicit offer of proof regarding the expected testimony of Gamer. Stella Gonsalvez testified that Gamer told her appellant had nothing to do with the theft and it is obvious from the record that Gamer was expected to testify to the same effect. Nor is it critical that defense counsel did not object to the voir dire in question at the time the assertedly improper statements were made and did not move for a mistrial on the ground of the claimed intimidation of the witness. *Webb* v. *Texas* (1972) 409 U.S. 95 [34 L.Ed.2d 330, 93 S.Ct. 351] establishes that counsel need not interrupt a judge admonishing a prospective witness in order to preserve the right to challenge that admonition on appeal. Additionally, defense counsel did move to dismiss the charges against appellant following Gamer's assertion of the privilege and the district attorney's refusal to grant immunity. See also Penal Code section 1469.

## Discussion

■ "Few rights are more fundamental than that of an accused to present witnesses in his own defense." (*Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 312, 93 S.Ct. 1038]; see also *Faretta* v. *California* (1975) 422 U.S. 806, 818 [45 L.Ed.2d 562, 572, 95 S.Ct. 2525]; *United States* v. *Nixon* (1974) 418 U.S. 683, 711 [41 L.Ed.2d 1039, 1065, 94 S.Ct. 3090]; *Webb* v. *Texas, supra,* 409 U.S. 95; *Washington* v. *Texas* (1967) 388 U.S. 14 [41 L.Ed.2d 1039, 94 S.Ct. 3090].)

"The Sixth Amendment preserves the right to the defendant 'to have compulsory process for obtaining witnesses in his favor.' *Washington* v. *Texas,* [*supra,*] 388 U.S. 14, 19 . . ., clearly established that a party's right to present his own witnesses in establishing a defense is a fundamental component of due process: [t]he right to offer the testimony of witnesses, and to compel their attendance if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." (*United States* v. *Blackwell* (D.C. Cir. 1982) 694 F.2d 1325, 1333.)

"While this basic right is violated by a state statute that simply forbids the presentation of certain types of witnesses (*Washington* v. *Texas, supra*) it is also violated where judicial misconduct (*Webb* v. *Texas, supra*) or prosecutorial misconduct (See, e.g., *United States* v. *Morrison* (3d Cir. 1976) 535 F.2d 223) leads to the same result: interference with the right to present the testimony of witnesses." (*Berg* v. *Morris* (E.D.Cal. 1980) 483 F.Supp. 179, 182; see *People* v. *Bryant* (1984) 157 Cal.App.3d 582, 591 [203 Cal.Rptr. 733].)

In *United States* v. *Blackwell, supra,* 694 F.2d 1325, the court canvassed the federal cases holding that governmental and judicial intervention deprived a criminal defendant of the right to present his own witnesses to establish his defense.[2] ■ ■ Our review of those cases persuades us

---

[2] "*See, e.g., Webb* v. *Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam) (defense witness effectively driven off witness stand by remarks of trial judge regarding the penalties for perjury); *United States* v. *Smith,* 478 F.2d 976 (D.C. Cir. 1973) (defense witness told by prosecutor that if he testified as indicated by other testimony he could or would be prosecuted for carrying a concealed weapon, obstructing justice, and as an accessory to murder); *United States* v. *MacCloskey, 682 F.2d 468 (4th Cir. 1982) (U.S. Attorney telephoned defendant's girlfriend's attorney to advise him to remind his client that*

that the conduct of the prosecutor in this case (but not that of the trial judge) rises to the level of impermissible intimidation.

■    We recognize, of course, that when a trial court has reason to believe that a witness may be charged with a crime arising out of events to which he might testify, it has a duty to insure that the witness is fully advised of his privilege against self-incrimination. (*People* v. *Seastone* (1969) 3 Cal.App.3d 60, 68 [82 Cal.Rptr. 907], citing *People* v. *Barker* (1965) 232 Cal.App.2d 178 [42 Cal.Rptr. 651].)[3] If it elects to discharge this duty itself, rather than to appoint separate counsel to do so, the court must walk the fine line between, on the one hand, fully advising the witness of the danger of self-incrimination and the right not to testify, and, on the other hand, threatening the witness to an extent which materially impairs the defendant's due process right to present witnesses in his defense.

■    The court here advised the witness adequately of his Fifth Amendment rights and we find nothing improper in its admonition. Indeed, the witness in this case did seem to be genuinely confused about his obligation to testify and his right to remain silent. His questions indicated his belief that if he did not testify he could be incarcerated until he did so. At that point the court properly advised him "that taking the 5th doesn't mean a person is incarcerated." The court explained that a party who began to testify and then during cross-examination attempted to exercise his Fifth Amendment right not to testify could be held in contempt of court and in that event could be kept in jail for several days. It appears then that in fact the court assisted the witness by correctly warning him of the possible consequences of impeaching himself by his testimony and informing him that

if she testified at trial she could be reindicted on dropped charges); *United States* v. *Goodwin*, 625 F.2d 693 (5th Cir. 1980) (defense witnesses intimidated by threats of prison officials conditioned upon whether the witnesses testified at trial); *United States* v. *Hammond*, 598 F.2d 1008 (5th Cir. 1979) (defense witness threatened by FBI agent with retaliation in other cases pending against him); *United States* v. *Henricksen*, 564 F.2d 197 (5th Cir. 1977) (per curiam) (defense witness intimidated by terms of his plea bargain in another case); *United States* v. *Thomas*, 488 F.2d 334 (6th Cir. 1973) (per curiam) (defense witness told by secret service agent during recess of trial that he would be prosecuted for a felony if he testified); *Berg* v. *Morris*, 483 F.Supp. 179 (E.D. Cal. 1980) (trial court coerced witness into giving inculpatory evidence by twice warning him that his probation would be revoked and perjury charges filed if the truth were not told.)" (694 F.2d at pp. 1333-1334; see *People* v. *Bryant, supra,* 157 Cal.App.3d 582, 592 fn. 6.)

[3]Appellant cites *United States* v. *Luxenberg* (6th Cir. 1967) 374 F.2d 241, 246, for the proposition that no such duty exists. In *Luxenberg* the Sixth Circuit held that a witness, not in the position of a defendant, before a grand jury need not be advised of his right to refuse to incriminate himself. Whatever the merits of such position in the grand jury context, we refuse to extend this nonbinding authority to the facts in the instant case. Even if the court does not have an absolute duty to so advise the witness, we believe the better practice is for the court to appoint separate counsel to advise the witness to assure that the witness understands his rights.

he could not be penalized for asserting his Fifth Amendment rights at the outset.

The instant case is not one where "threatening and . . . coercive language indicating the court's expectation of perjury" establishes a violation of defendant's due process rights. (See *United States* v. *Harlin* (9th Cir. 1976) 539 F.2d 679, 681, cert. den. 429 U.S. 942 [50 L.Ed.2d 313, 97 S.Ct. 362]; *Berg* v. *Morris, supra,* 483 F.Supp. 179, 183.) In *United States* v. *Harlin, supra,* 539 F.2d 679, the court found no coercion in the trial judge's statement to a codefendant's counsel that he assumed counsel had warned the codefendant of the dangers of perjury and that the court could take apparent perjury into account. (*Id.,* at p. 680.) Indeed, in this case there was no mention of perjury penalties at all, nor was there any inference that the court was inclined to disbelieve the testimony of the witness.

■ We conclude, however, that the prosecutor's voir dire of Gamer crossed the line separating proper advisement from intimidation. The district attorney's statements represent the type of threat or coercion which has been held to violate due process. In this respect we believe the prosecutor's admonition is similar to that condemned in the recent case of *People* v. *Robinson* (1983) 144 Cal.App.3d 962 [193 Cal.Rptr. 92]. In *Robinson,* defense counsel had examined the prospective witness out of the presence of the jury concerning her understanding and willingness to waive her privilege against self-incrimination, using such terms as "could" and "might" in explaining the future possibility of her testimony being used against her. "The prosecuting attorney, apparently fearful that such admonishment was too indefinite, began her cross-examination of [the witness] in the following manner: [¶] 'Q. I'd like to change some of the wording of the questions that were asked you. [¶] As a representative of the District Attorney's Office, I need to advise you that charges not only can be charged against you, *but they will be filed, should you take the stand.* (Original italics.) [¶] Do you understand that? [¶] A. Yes. [¶] Q. And if you are convicted and because of your record, your past record can be used and will be used against you for any punishment. [¶] A. Yes, I understand that, too.'" (*People* v. *Robinson, supra,* at p. 970.)

In this case the witness was similarly threatened that if he testified he not only could but probably would be prosecuted by the district attorney's office. The prosecutor emphasized the likelihood of prosecution by advising Gamer of the evidence in the case to date, including the fact that his fingerprints had been found on the motorcycle, and that he would be required to explain their presence and the details of his acquisition of the cycle under cross-examination. The prosecutor advised that he could use this evidence to charge Gamer with the crime and that the district attorney's office was

more likely to do this than not. The district attorney's final statement—that if Gamer testified, "we are going to use everything against you that we have got"—is most analogous to the prosecutorial admonition condemned in *Robinson*. Indeed, the likelihood that this statement was received by Gamer as a threat is indicated by the fact that he invoked his privilege not to testify without hesitation immediately after it was made. ■ In this connection, "[a]ppellant need not establish that the prosecutor's remarks were either the direct or exclusive factor in the witness' decision not to testify; all that need be shown is a strong suggestion the comments were the cause." (*People* v. *Bryant, supra,* 157 Cal.App.3d 582, 590.)

This case graphically illustrates the almost inherently coercive effect of a prosecutor's advising a defense witness of the privilege against self-incrimination. The only respect in which a prosecutor may arguably be better situated than others to provide such advice is that his office actually makes the decision to prosecute. But it is this very power that infects a prosecutorial admonition of the right of a defense witness not to testify with a perilous potential for improper intimidation; and this is so regardless of the propriety in fact of the prosecutor's motives. (See *People* v. *Robinson, supra,* 144 Cal.App.3d at p. 971.) ■ Accordingly, we hold that, in this situation, a trial judge should recommend that the witness seek advice from separate counsel or, if appropriate, appoint counsel to render such advice. Often, the public defender or regularly appointed private counsel is readily available to undertake such an assignment so that the trial would not be unnecessarily delayed by such a procedure.[4]

■ Respondent contends that even if the advisement of witness Gamer was intimidating and violated appellant's due process rights to present his witnesses, such error was harmless as the testimony of Gamer would have been cumulative to that presented by witness Stella Gonsalvez. In *People* v. *Robinson, supra,* 144 Cal.App.3d 962, 971, the court found that the prosecutor had improperly intimidated a defense witness but interpreted the Supreme Court's decision in *United States* v. *Valenzuela-Bernal* (1982) 458 U.S. 858 [73 L.Ed.2d 1193, 102 S.Ct. 3440] to require reversal in such case only if it appeared, as it did not in *Robinson,* that the failure of the defense witness to testify may have affected the outcome of the appellant's trial. The Court of Appeal in *People* v. *Bryant, supra,* 157 Cal.App.3d 582 disagreed, asserting that "[o]ur reading of the *Valenzuela-Bernal* opinion prompts us to conclude Justice Rehnquist really stated that because the respondent-defendant in that case made no effort to explain what *material,*

---

[4]Although the trial court in this case acknowledged that a particular public defender had previously represented the witness, he declined to contact that attorney until after advising the witness and determining whether the witness would testify.

favorable evidence the deported passengers would have provided for his defense, he *failed to establish a violation* of the Fifth or Sixth Amendments.[5] We note that in the *Valenzuela-Bernal* case, *Webb* v. *Texas* was not overruled, or even discussed.

"In *Cordova* v. *Superior Court* (1983) 148 Cal.App.3d 177, 183 . . ., we concluded that the California test of materiality enuciated in the *Mejia* case (*People* v. *Mejia, supra,* 57 Cal.App.3d 574, 580) was not changed by the holding in *Valenzuela-Bernal,* saying it was unclear whether the California rule was based upon the federal (14th Amend., U.S. Const.) or the state (Cal. Const., art. I, § 7) due process clause, and noting that California may dispose of the issue upon independent state grounds. (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 549-550 . . .; *Cordova* v. *Superior Court, supra,* at p. 183.) In *Cordova* we held that the witnesses, who were unavailable for defendant's trial, because they had been deported, were material witnesses; the case was reversed without discussion of prejudice." (*People* v. *Bryant, supra,* at p. 593.)

After discussing the split among federal cases, several of which found intimidation of a witness to be reversible per se while others utilized a harmless error analysis, the *Bryant* court concluded: "We hold that 'the constitutional rights involved in the present case are "so basic to a fair trial that their infraction can never be treated as harmless error. . . ." (*Chapman, supra,* [386 U.S. 18 . . .] at 23 . . . .' (*Berg* v. *Morris, supra,* 483 F.Supp. 179, 186.) Therefore, 'reversal is required without an examination of prejudice.' (*Ibid.*)" (*People* v. *Bryant, supra,* at p. 594.)

Although we believe that the *Bryant* case is the better reasoned with regard to the standard for prejudice, it is not necessary for us in this case to determine the appropriate standard because, in any event, we cannot conclude that the error in this case was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Despite the testimony of Stella Gonsalvez as to what the witness had previously said to her, and the prosecution's waiver of a hearsay objection to this testimony, Gamer was a material witness prevented from testifying by the threatening statements of the prosecutor. The testimony of Gamer himself would have carried far more weight than that of Mrs. Gonsalvez relating what Gamer purportedly told her. Among other things, Gamer's testimony would have been against the inter-

---

[5]In a footnote at this point the court states: "*Valenzuela-Bernal* was charged with transportation of an illegal alien, in violation of immigration laws; two other persons, also illegal aliens, who were passengers in the car with the accused and the transported alien, were deported before the accused had the opportunity to interview them."

est of the witness himself rather than from a third party friendly to the defendant.

The judgment is reversed.

Rouse, J., and Smith, J., concurred.