[No. C059069. Third Dist. Mar. 1; 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN TREADWAY, Defendant and Appellant.

**COUNSEL**

Ann Hopkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Michael P. Farrell, Assistant Attorney General, R. Todd Marshall and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**RAYE, Acting P. J.**—Jacob Miller, Charles Morgan, and defendant Steven Treadway were charged with attempted murder (Pen. Code, §§ 664, 187, subd. (a)),[1] conspiracy to commit robbery (§§ 182, subd. (a)(1), 211), attempted second degree robbery (§§ 664, 211), and assault with a firearm (§ 245, subd. (a)(2)). Defendant was also alleged to have personally used and discharged a firearm, causing great bodily injury, in the commission of the first three offenses (§ 12022.53, subds. (b), (c) & (d)), and to have personally used a firearm and inflicted great bodily injury in the commission of the fourth offense (§§ 12022.5, subds. (a) & (d), 12022.7, subd. (a)).

Codefendants Miller and Morgan entered into negotiated plea agreements. As a condition of their agreements, the prosecution required Miller and Morgan to agree not to testify at defendant's trial even though the 18-year-old defendant was brain damaged and they were percipient witnesses to the shooting that occurred three days after defendant was released from a psychiatric unit.

At the close of the prosecution's case, the trial court dismissed the conspiracy count. The jury found defendant guilty of attempted robbery and assault with a firearm, and found the special allegations true. The jury was unable to reach a verdict on the attempted murder count and a mistrial was declared.

The trial court sentenced defendant to 18 months in state prison for the attempted robbery and 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), and stayed imposition of the remaining sentence pursuant to section 654.

In closing argument, defendant, through counsel, conceded he shot the victim in an apparent attempt to rob him. His sole defense was that he did not have the requisite intent to sustain the firearm enhancements. On appeal, he contends he was denied his constitutional rights to compulsory process and due process by the prosecution's plea bargains barring two material witnesses from testifying at his trial, two witnesses who could have provided evidence favorable to his defense. We agree as to Morgan but not Miller, and reverse the judgment.

## FACTS

On October 8, 2006, defendant, then 18 years old, was hit by a drunk driver and sustained catastrophic injuries, including a severe closed-head

---

[1] All further statutory references are to the Penal Code.

injury, a broken shoulder, a broken collarbone, several fractures of the spine, a collapsed lung, damage to the small and large intestines, a bruised liver, and a bruised pancreas. His spleen was removed. He was hospitalized for eight days. His recovery following his release from the hospital was slow. Initially, he could not dress himself and he became depressed. Friends and family members testified he was a completely different person after the accident; while he had been fun and easygoing before, he became violent and easily provoked after. He suffered nightmares and was terrified he was going to die.

By the middle of November, defendant's mental condition was deteriorating. On November 14 a friend drove to defendant's house to pick him up and defendant came running outside, climbed on the hood of the car, and started smashing the windshield with his foot. His family persuaded him to admit himself to Sutter psychiatric hospital, where he stayed for about five days.

On November 19, a few hours after being released, defendant jumped out of bed and announced he was returning to the hospital. He refused his mother's offer to drive him there, and he threatened to kill himself if she called 911. She called 911 as soon as he left. Soon he called his mother to inform her he had crashed his truck and was going to jump in front of a car. He was put on a 72-hour hold at Sacramento County Mental Health Clinic and eventually transferred back to Sutter psychiatric hospital, where he remained until November 26.

Three days later defendant and his friend Jacob Miller were at Chuck Morgan's house, where the friends drank, played cards, and watched a movie. Miller, Morgan, and defendant left in Miller's Lincoln Continental to buy cigarettes. Defendant got out of the car and approached the victim, who was walking to work at 3:30 a.m. According to the victim, defendant drew a gun, pointed it at him, and stated, "[G]ive me everything you got or I'll kill you."

As he reached for his wallet, which was in his right rear pocket, the victim heard what he thought was gunfire. He threw his bag lunch and charged defendant in an attempt to grab the gun. Defendant broke away and shot him four more times. The victim was hospitalized for 11 days, missed work for two months, and continues to suffer chronic pain.

Morgan, Miller, and defendant went back to Morgan's house. Morgan told another friend, Steven Jones, who had fallen asleep on his couch, "Treadway's crazy, he just shot somebody." Jones confronted defendant. Defendant replied that someone had swung a bag at him, and he had shot and killed him. Jones notified the police, and defendant was apprehended.

Defendant's taped police interview was played for the jury. During the interview, defendant sobs uncontrollably, lies on the floor, blows his nose on

his shirt and then wipes his face with the same part of the shirt, and hits his head on the table. At one point, he tells the interviewer he had blacked out. Then he remembers riding down Stockton Boulevard and hearing "some guy yelling and I looked down the street and the guy's on the ground and I was like, what did I do . . . what did I do?" He remembers running back to Miller's car and telling him, "I think I just killed some person." Explaining Morgan's and Miller's roles, he states that Miller had given him the gun, he had returned it, and "[Morgan] was like let's rob somebody and [Miller] was like, yeah, whatever . . . whatever and then . . . something in my head just . . . like it[']s just like I'm some other person."

During the interview, defendant expresses profound remorse. He states, "I'm sorry . . . I'm really sorry. If you need any . . . anything, any help, I'll help you as much as you need. If you need any body part of mine, it's yours. I'm just not myself anymore. I'm . . . (Indistinguishable—crying) . . . stable or not. I'm really sorry. I'm willing to give my life for your[s] right now and trade position with you just for what I did. I'm so sorry." He expresses his desire to kill himself.

The police also interviewed Morgan. Morgan stated he did not think that, as a result of his car accident, defendant was "all there." He explained that defendant had tried to kill himself and had just been released from a mental hospital a couple of days earlier. Since his accident, Morgan stated, "he don't seem like the same person."

Although Morgan initially denied knowing anything about the shooting, he finally admitted that defendant shot someone. He reported again that defendant "was not all there. Like he was not in his right mind." When he finally admitted he had been in the car with defendant and Miller, he explained what defendant said as he returned after the shooting: "He was trippin', what did I do? Un, I don't know. He was just trippin' out. He didn't know what the hell he did. [¶] . . . [¶] . . . I think he wasn't—he just didn't know what the heck he just did." Morgan repeated that defendant had just been released from a mental hospital and "since he got in a real bad accident, he's not all there no more. . . . He's like really crazy. He really needs some mental help."

A neuropsychologist performed two days of testing on defendant to determine the extent of the brain damage he had suffered. She concluded defendant had suffered a severe brain injury and a significant psychiatric disorder, and was experiencing postconcussion syndrome as well as posttraumatic stress disorder. She opined that in a stressful situation, this type of brain is easily flooded or overwhelmed and the individual becomes "cognitively paralyzed." Because the frontal cortex and the "temporal lambic [sic] cortex" are significantly impaired, the amygdala, the part of the brain that

responds to motion, "starts to run the show." According to the neuropsychologist, once the amygdala takes over and floods the brain with adrenaline, a person with the type of brain damage defendant had suffered would not be conscious of his actions.

This expert further explained that posttraumatic stress disorder would exacerbate the cognitive paralysis. "With a person with posttraumatic stress disorder, what happens is it's a very overexaggerated startle response, and it is overexaggerated in intensity, and it's overexaggerated in that it goes beyond the state of the startle response and becomes a whole action all by itself." The combination of the neurological and psychological impairments, in the neuropsychologist's opinion, would impair the formation of an intent to kill or to volitionally discharge a firearm.

## DISCUSSION

█ A defendant's right to present a defense, including, most importantly, the right to " 'offer the testimony of witnesses, and to compel their attendance, if necessary,' " is at the very heart of our criminal justice system. (*In re Martin* (1987) 44 Cal.3d 1, 29 [241 Cal.Rptr. 263, 744 P.2d 374].) The right to compulsory process is enshrined in the Sixth Amendment to the United States Constitution, guaranteed in state prosecutions by virtue of the Fourteenth Amendment to the United States Constitution, and expressly protected by article I, section 15 of the California Constitution.

It goes without saying, therefore, that the government cannot block or hinder a criminal defendant's access to witnesses whose testimony would be material and favorable to the defense. (*In re Martin, supra,* 44 Cal.3d at pp. 30–32.) The question presented here is whether the government's requirement that defendant's two codefendants *not* testify at his trial as a condition of their plea agreements violates his right to due process and compulsory process. The Attorney General cites no cases in which a prosecutor conditioned a plea agreement on the accused's inability to testify in his codefendant's defense and the practice withstood a due process challenge by the hamstrung defendant. The solitary case cited by the Attorney General is inapposite.

*People v. Conerly* (2009) 176 Cal.App.4th 240 [98 Cal.Rptr.3d 76] (*Conerly*) did not involve a due process or compulsory process challenge at all. Rather, the defendant argued the trial court abused its discretion by denying his motion to sever his trial from that of his codefendant. (*Id.* at p. 245.) The only common denominator between *Conerly* and our case is the fact that the prosecutor entered into a plea agreement with defendant's codefendant. The terms and timing of the agreement were very different.

The plea agreement initially offered by the prosecution in *Conerly* involved a "package deal," that is, it was a deal that had to be accepted by all codefendants. "[P]ackage offers are valid so long as their terms are not coercive. [Citation.] In *In re Ibarra* (1983) 34 Cal.3d 277, 289, fn. 5 [193 Cal.Rptr. 538, 666 P.2d 980] . . . , our Supreme Court expressly acknowledged the utility of package offers: 'We recognize that the "package-deal" may be a *valuable tool* to the prosecutor, who has a need for *all* defendants, or none, to plead guilty. The prosecutor may be properly interested in avoiding the time, delay and expense of trial of all the defendants.' [Citation.] As relevant here, the Supreme Court went on to indicate there is nothing improper about a package offer that effectively prevents one defendant from pleading guilty in order to exculpate another defendant: The prosecutor 'is also placed in a difficult position should one defendant plead and another go to trial, because the defendant who pleads may become an adverse witness on behalf of his codefendant, free of jeopardy. Thus, the prosecutor's motivation for proposing a "package-deal" bargain may be strictly legitimate and free of extrinsic forces.' [Citation.]" (*Conerly, supra,* 176 Cal.App.4th at p. 249.) The "package" nature of the deal eliminates the very constitutional pitfalls evident in the plea agreements accepted by defendant's two codefendants.

In *Conerly,* one of the two defendants refused the package deal and proceeded to trial. (*Conerly, supra,* 176 Cal.App.4th at p. 245.) His motion to sever was denied. (*Id.* at p. 246.) The court merely held that the offer of a package deal "did not transform [the codefendant] from a willing witness into an unwilling one." (*Id.* at p. 248.) The court went on to discuss the propriety of package deals as discussed above. Midtrial, however, the codefendant entered an open plea with no guaranteed minimum sentence. (*Id.* at pp. 245–247.) The defendant did not challenge the propriety of the open plea, and the Court of Appeal certainly did not discuss it. Rather, the court found the trial court had not abused its discretion by denying the motion to sever based on the prosecution's offer of a package deal. (*Id.* at pp. 249, 253.)

Defendant's authority hits closer to the mark, although he relies substantially on federal and out-of-state cases. As defendant points out, the Attorney General fails to mention, let alone analyze, any of the cases he cites. The basic principles are well established in California jurisprudence.

■ " ' "Governmental interference violative of a defendant's compulsory-process right includes, of course, the intimidation of defense witnesses by the prosecution. [Citations.] [¶] The forms that such prosecutorial misconduct may take are many and varied. They include, for example, statements to defense witnesses to the effect that they would be prosecuted for any crimes they reveal or commit in the course of their testimony. [Citations.]" [Citation.] Threatening a defense witness with a perjury prosecution also constitutes prosecutorial misconduct that violates a defendant's constitutional

rights. [Citation.]' [Citation.] Due process also is violated when the prosecution makes a material witness unavailable by, for example, deportation." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 52 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

In *People v. Warren* (1984) 161 Cal.App.3d 961 [207 Cal.Rptr. 912] (*Warren*), a prosecutor threatened a defense witness during voir dire that "if he testified he not only could but probably would be prosecuted by the district attorney's office." (*Id.* at p. 973.) The witness immediately invoked his privilege not to testify. The court held that the defendant did not need to prove that the prosecutor's threats were either the direct or exclusive factor in the witness's decision not to testify, but only that there is a strong suggestion the prosecutor's comments induced him to invoke his privilege. (*Id.* at p. 974.)

The court highlighted the power of the office of the prosecutor and the potential for intimidation. "This case graphically illustrates the almost inherently coercive effect of a prosecutor's advising a defense witness of the privilege against self-incrimination. The only respect in which a prosecutor may arguably be better situated than others to provide such advice is that his office actually makes the decision to prosecute. But it is this very power that infects a prosecutorial admonition of the right of a defense witness not to testify with a perilous potential for improper intimidation; and this is so regardless of the propriety in fact of the prosecutor's motives." (*Warren, supra*, 161 Cal.App.3d at p. 974.)

Here the prosecutor did not merely advise the witnesses not to testify, he made it an outright condition of their plea bargains. Thus in order to secure a specific term of imprisonment, the witnesses had to agree not to testify in defendant's trial. It is hard to imagine a more explicit form of coercion than that.

Similar, although less egregious, facts were presented to the Fourth Circuit Court of Appeals in *U.S. v. MacCloskey* (4th Cir. 1982) 682 F.2d 468. On the eve of trial, a United States Attorney called a codefendant's lawyer and told him "that he would be well-advised to remind his client that, if she testified at [the defendant's] trial, she could be reindicted if she incriminated herself during that testimony." (*Id.* at p. 475.) She, like the witness in *Warren*, thereafter invoked her right not to testify. The United States Attorney's " 'ill-advised and possibly improper' " telephone call, according to the Fourth Circuit, "violated the defendant's due process right to present his defense witnesses freely." (*Id.* at p. 479.)

In *State v. Hofstetter* (1994) 75 Wn.App. 390, 401 and footnote 10 [878 P.2d 474, 481 & fn. 10], the prosecution advised two witnesses not to

speak to defense counsel unless a prosecutor was present and also threatened to withdraw its plea offer. The court found prosecutorial misconduct but also held that "it is improper for a prosecutor to plea bargain in such a way as to impose such instructions or advice on a witness. At least in the absence of extraordinary circumstances, the fact the State is prosecuting a case against the witness does not alter the State's duty not to obstruct access to the witness in the case against the defendant." (*Id.*, 878 P.2d at pp. 481–482.)

■ We too conclude it was improper for the prosecutor to condition the codefendants' plea bargains on their agreement not to testify in defendant's trial. As defendant points out, the condition does not bind them merely to testify truthfully, but imposes the blanket restriction on them not to testify at all. Defendant must demonstrate, however, not only that the prosecutor's conduct was improper, but also that the testimony of the witnesses would have been both material and favorable to the defense.

Defendant argues, as he did at trial, that the use of the firearm was not volitional and he was not legally conscious when he fired it. He contends that his codefendants were percipient witnesses to his behavior immediately following the shooting and would add powerful evidence that his mental health at that time precluded him from intending to discharge a firearm. The Attorney General insists defendant never intended to call his codefendants to testify, there was no guarantee they would not have invoked their Fifth Amendment right not to testify, and even if they had, their testimony about defendant's mental health would have been cumulative to the testimony of family, friends, and the neuropsychologist.

Defendant pays little attention to Miller. While there is a brief hearsay reference that Morgan said that Miller said defendant was crazy, we do not believe the record supports defendant's vague assertion that Miller's testimony would have been material and favorable. There is simply an inadequate showing of what testimony Miller might have provided.

Not so, however, with Morgan's potential testimony. The record contains a long transcript of his police interview wherein he repeatedly described defendant as "not all there," "not in his right mind," "just trippin'," "crazy," and stated "[h]e didn't know what the hell he did." Morgan's testimony had a force and credibility far stronger than any of the other witnesses who testified at trial, as he could attest to defendant's mental state at the time of the shooting. The expert neuropsychologist had testified that the brain damage defendant had suffered, coupled with the posttraumatic stress disorder, made

his cognitive ability fragile and unstable. In particular, his mental state would deteriorate in a stressful situation even though at other times he might function more normally. Thus Morgan, as a percipient witness to how defendant behaved at the time of the shooting, was pivotal to his defense that once the victim threw his lunch bag and lunged at him, he became cognitively paralyzed and unable to form the requisite intent to murder or to discharge a firearm. Morgan, moreover, could add considerable force to the tricky notion that defendant was not legally conscious at the moment he began firing the gun.

Consequently, we conclude Morgan's testimony would not have been merely cumulative to the testimony provided by those who knew defendant before and after the accident, nor to the expert opinions offered by the neuropsychologist. Defendant argued that as a result of brain damage, his act of shooting the victim was neither conscious nor volitional. Morgan's observations were the only observations close enough in time to support defendant's claim.

Additionally, we must point out that the jury hung on the attempted murder count. Thus, the jurors were unable to agree that defendant had the specific intent to kill. We cannot say, therefore, that the absence of Morgan's pivotal testimony was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) Perhaps the jurors, informed by what Morgan observed immediately following the shooting, would have also concluded the shooting was not volitional or that defendant was not conscious of what he was doing.

The Attorney General would excuse the prosecutor's transgression of defendant's rights to due process and compulsory process based on defendant's pretrial list of witnesses and the possibility the codefendants would have refused to testify even in the absence of the plea agreement. Defendant's mental health may have been fragile, but his constitutional rights were not. We do not accept the Attorney General's hypothesis that since Miller and Morgan did not appear on the witness list, they did not have exculpatory evidence. Indeed, as defendant replies, it is far more likely that they were willing to testify since the prosecutor insisted on conditioning their plea deals on their agreement not to testify. Nor does defendant's right to compulsory process evaporate based on the abstract possibility the codefendants would have invoked their Fifth Amendment privilege. As defendant aptly points out, absent the plea agreement, his codefendants had an absolute right to choose to testify. Here, however, the prosecution made a material witness unavailable and, in so doing, violated defendant's right to due process.

## DISPOSITION

The judgment is reversed.

Robie, J., and Butz, J., concurred.