[No. S004399, Crim. No. 22311. July 28, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
BILLY RAY HAMILTON, Defendant and Appellant.

126

128

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Musawwir Spiegel, Deputy State Public Defender, and Louis N. Hiken for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Herbert F. Wilkinson, Edmund D. McMurray, Ronald S. Prager and Ward D. Campbell, Deputy Attorneys General, for Plaintiff and Respondent.

Kent S. Scheidegger and Lon Hamburger as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death imposed under the 1978 death penalty law (*id.*, § 190.1 et seq.).

Defendant was convicted in three counts of the first degree murders of Josephine Rocha, Douglas White, and Bryon Schletewitz (Pen. Code, §§ 187, 189), in one count of the attempted robbery of Schletewitz (*id.*, §§ 211, 664), and in two counts of assault with a deadly weapon against Joe Rios and Jack Abbott (*id.*, § 245, subd. (a)). As to each murder count, three

special circumstances were found true: felony murder-robbery (*id.*, § 190.2, subd. (a)(17)(i)), multiple murder predicated on the killing of one of the two other victims (*id.*, § 190.2, subd. (a)(3)), and multiple murder predicated on the killing of the other (*ibid.*).

In our initial opinion in this matter, we affirmed the judgment as to guilt, concluding that no reversible error had occurred at trial. We also set aside the special circumstance findings and reversed the judgment as to penalty. We reasoned that in violation of *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], and *People v. Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669], the court failed to instruct the jury that intent to kill was an element of the felony-murder and multiple-murder special circumstances. We further reasoned that the errors fell within the scope of the general rule of automatic reversal declared in *People v. Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], and outside of any of its exceptions.

After granting the Attorney General's petition for rehearing, we have reconsidered, and overruled, *Carlos* and *Turner*. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1147, 1149-1150 [240 Cal.Rptr. 585, 742 P.2d 1306].) As we shall explain, now as before we conclude that the judgment must be affirmed as to guilt. We now conclude, however, that the special circumstances must be upheld: on the facts of this case the court was not obligated to instruct on intent to kill, and hence its failure to do so was not error. Finally, we conclude that the judgment must be affirmed as to penalty.

## I. FACTS

On August 29, 1980, defendant was released from Folsom Prison. While there he had met Clarence Ray Allen. In 1974 Allen had masterminded the burglary of Fran's Market in Fresno by his crime "family" and had subsequently ordered the execution of a member of the "family" who had "snitched." In 1977 Allen was tried and convicted of burglary and murder, among other offenses, and was sentenced to prison; Ray Schletewitz, one of the owners of Fran's Market, and his son Bryon had testified against Allen. On September 2, 1980, Allen's son Kenneth wired defendant $100. During the week preceding September 5, 1980, defendant and one Connie Barbo had visited the home of Kenneth Allen and his wife Kathy several times. A photograph of defendant was subsequently found there. Clarence Ray Allen had access to Folsom prison records, including photographs of inmates.

On September 4, 1980, just before the 8 p.m. closing time, defendant and Barbo entered Fran's Market and bought several items. Joe Rios handled their purchases. At 7:57 p.m. the next day defendant and Barbo returned;

one of the clerks locked the front door after they entered. No other customers were present, and the employees were closing the store. Defendant and Barbo went back to the meat counter where Rios wrapped several items for them. Rios began to sweep the aisles, but kept an eye on the couple because he suspected they might shoplift. After watching them go down several aisles and put items in a shopping cart, however, he decided they were not planning to steal. He went back to the stock room at the rear of the store.

As Rios walked into the stock room, he saw his fellow employees—Douglas White, Bryon Schletewitz, and Josephine Rocha—walking in behind him, followed by Barbo and defendant, who was holding a sawed-off shotgun. Defendant ordered all the employees to lie on the floor. He then directed White into the freezer to open the safe. White protested there was no safe there. Schletewitz then identified himself and offered to open the safe, and led defendant to a room behind the freezer where the safe was located. Barbo held a revolver on the other employees.

From where he lay, Rios could hear some scuffling between Schletewitz and defendant. He heard defendant say "You better not get a gun," and then a loud bang. Defendant emerged from behind the freezer and said to White, "Okay, big boy, where is that safe?" When White said he did not know, defendant shot him in the neck. At that point Rios dashed to the bathroom and tried to lock himself in. Rocha was still sitting on the stockroom floor. From inside the bathroom, Rios heard another shot. The bathroom door then opened and defendant loaded his shotgun, aimed, and fired at Rios. Rios managed to raise his left arm to cover his face, sustaining severe injuries to the arm and elbow.

Defendant said, "Let's go, babe," and Rios then heard defendant and Barbo go to the front of the store. Emerging from the bathroom, Rios saw the three other employees lying on the floor. Defendant and Barbo tried to leave by the locked front door as Rios raced out the back door. A voice called out to him to halt and a shot was fired, but he kept running.

When Jack Abbott, who lived behind Fran's Market, heard the shots, he got his shotgun, which was loaded with shells containing No. 6 pellets, and ran toward the store as Rios ran out. Abbott went into the store, where he saw White and Rocha. As Abbott was leaving he was shot in the left hip. He turned and saw the man who shot him standing in the doorway. He shot back as the man ran toward his car. The man groaned and stumbled as he got in the car and drove away. The man had the same physique as defendant.

Just before 8:30 p.m. the police arrived and found Barbo hiding in the bathroom and her revolver in the toilet tank. Rocha, White, and Schletew-

itz died from massive shotgun wounds. The front door of Fran's Market was stained with blood later found to match defendant's type. Around 10 p.m. Kenneth Allen sold Barbo's car, a Mercury Comet, to a friend. Bloodstains matching defendant's blood type but not Allen's were later found inside the Comet. Several days after the event, Rios selected defendant's picture from a photographic lineup. He was confident of his identification because he had seen defendant and Barbo on two successive evenings and had recognized them.

On September 10, 1980, defendant was arrested in Modesto following a robbery at a liquor store. The lower left leg of his pants and his left shoe had small holes in them. His left foot bore several small circular injuries and contained five foreign objects the size of No. 6 shotgun pellets. He also had a several-day-old laceration of the skin between his right thumb and forefinger, a type of injury frequently caused by the recoil of a sawed-off shotgun. A Cadillac registered to Kenneth Allen was parked near the liquor store; it bore defendant's fingerprints and was stained with blood matching defendant's type but not Allen's. Following defendant's arrest the police found in his possession a piece of paper that the parties refer to as the "hit list." This document bore, in defendant's handwriting, the names of Kenneth and Kathy Allen, the names of Bryon Schletewitz and his father Ray, and the name and address of Fran's Market. As stated above, Ray and Bryon Schletewitz had testified against Clarence Ray Allen at his 1977 trial.

Defendant put on a defense of mistaken identity. The deputy sheriff who took Abbott's initial statement testified that Abbott had been unable to identify or describe the man who shot at him except as a "dark-haired male." Abbott said he had seen only a silhouette in the doorway when he looked to see where the shots were coming from.

Kathy Allen's brother, William Proctor, testified he saw a third man with Kenneth and defendant at the Allen house on September 5, 1980. Proctor claimed the third man was tall and muscular like defendant. He also testified defendant was walking with a slight limp that day, as though he had a twisted ankle. Proctor asserted that Barbo was not present at the Allen home that evening.

Also testifying for the defense, Shane Callaway first claimed he accidentally shot defendant in the foot on September 4, 1980. He stated defendant and Kenneth Allen had come to his house to collect a debt that he owed Allen; he paid under duress, but said he would get even; defendant laughed; he then angrily pulled out a shotgun and accidentally caused it to discharge into defendant's foot. Callaway admitted he had been at the Allen house several times since September 5, 1980, and had talked with Kathy Allen and

was aware Kenneth had been charged in connection with the Fran's Market killings. He denied, however, knowing the perpetrator had been shot in the foot. He also denied discussing any of the events at Fran's Market with Kathy. Following Callaway's testimony, the defense rested.

As Callaway left the courtroom, he was arrested on two outstanding misdemeanor warrants. Soon thereafter, the court released Callaway on his own recognizance and directed him to the public defender's office where he conferred with an attorney.

When the court reconvened later that day, Callaway, his public defender, defense counsel, and the prosecutor were present. The public defender informed the court that he had discussed both the misdemeanor warrants and possible perjury charges with Callaway. The public defender and the prosecutor agreed that Callaway—who had returned to testify from Utah without a subpoena—should be immune from arrest on the warrants under "the spirit of [Penal Code] section 1334.4"—the codification of the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings. They also agreed that Callaway would be given immunity from prosecution for perjury in his earlier testimony in exchange for testifying for the prosecution.

Before Callaway took the stand again, defense counsel moved to preclude his expected testimony to the effect that he had agreed to testify on defendant's behalf only after members of his family received anonymous telephone threats. Counsel based the motion on the ground that no connection between the threats and defendant had been established. The court denied the motion, but admitted the evidence only to show Callaway's state of mind and not defendant's consciousness of guilt.

Callaway then entirely recanted his earlier testimony for the defense. He stated instead that on September 3 and 4, 1980, he had been working at a copper mine in Eureka, Utah, until 7 or 8 a.m. The airport nearest to Eureka is 120 or 130 miles away. He said that he could not have reached Fresno on September 4, 1980, and in fact was not there that day.

He further testified that Kathy Allen was a good friend, and that he had spoken with her a month and a half before the trial. At the time he was living in Fresno. When he agreed to testify for Kenneth, she gave him a letter containing the substance of what he was supposed to say. He flushed the letter down the jail toilet immediately after his arrest that day. Kathy supplied him with a description of defendant, whom he had never met, and thereafter was present when he first talked to the defense investigator at the Allen home. After his interview with the investigator, he decided not to

testify and went back to Utah. When members of his family received anonymous telephone threats, however, he agreed to testify for defendant and returned to California.[1]

At the penalty phase, the prosecution introduced evidence of three other crimes committed by defendant: a 1973 escape from a Kentucky jail, a 1977 robbery, and the September 10, 1980, liquor store robbery in Modesto.

The former chaplain of the Kentucky jail testified about the escape. One evening he received a note from defendant that the television set in one of the cells was out of order. When he went to investigate, three of the inmates in that cell, including defendant, tied him up and took the key. Holding a knife to his neck, the inmates used him to get past the electronic doors and escape.

In 1977 defendant robbed a man in San Jose, taking some money and a watch. The man, who was elderly and in poor health, suffered numerous facial cuts and bruises during the robbery. When arrested, defendant told the police he hit the victim in self-defense.

Raymond Pifer was a clerk at a Modesto liquor store on September 10, 1980, when defendant pulled a knife and demanded money. Putting money in a paper bag, Pifer complied. As defendant left the store, he brandished the knife at a customer who was blocking the doorway. Pifer called the police and defendant was arrested within minutes a block from the store. Both Pifer and the customer identified defendant as the robber. A nylon stocking and cap that Pifer said the robber wore were found between the liquor store and the site of defendant's arrest, and there was a paper bag containing money in defendant's pocket.

Defendant presented evidence concerning his character and background. His sister, Phyllis G., testified that she, defendant, and their sister had essentially been abandoned by their parents at a tender age. The three children had been sent to stay with grandparents in Kentucky one summer when they were three, five, and seven years old. Their mother was supposed to retrieve them but never did. Years later, the mother sent a letter saying she did not want the children.

Phyllis stated that the children saw their father occasionally over the years, but he never lived with them or provided for them. They were raised and supported by their grandparents with some assistance from an aunt and

---

[1] After Callaway's recantation defense counsel moved to strike the evidence of threats on the same ground as his earlier motion to preclude, i.e., that no connection between the threats and defendant had been established. The court again denied the motion.

uncle. Defendant left high school in his junior year when the grandparents died; she last saw him in 1969.

Nona Curry testified defendant had lived at her mother's house in Kentucky between 1968 and 1971. Defendant and Curry's brother, Nelson Pettit, were friends and often stayed at Curry's house. They helped with work around the house, and babysat her daughter.

Pettit testified he had helped defendant get a job after defendant dropped out of school. They worked together at several jobs over a four-year period, beginning in 1969. Both of them frequently stayed at Pettit's parents' house, and both worked to remodel Pettit's grandmother's house. Pettit described defendant as one of the family during this time. They lost contact, however, when Pettit married and moved to Florida.

Michael Dunham stated he had supervised defendant at a Salvation Army rehabilitation center in San Jose in 1977. Defendant was a warehouse and dock worker, and also drove a truck to collect donations. Defendant had a drinking problem and became violent when drunk. When sober, however, he was "a kind person, a good human being, a person that would help other people."

Prison reports showed defendant to be a cooperative worker in prison.

## II. GUILT ISSUES

### A. *Jury-selection Issues*

Defendant contends that the "death qualification" of the jury prior to the guilt phase of his trial violated his right to a jury drawn from a fair cross-section of the community. He also contends that "death qualification" violated his constitutional right to an impartial jury. Both points must be rejected. (*Lockhart* v. *McCree* (1986) 476 U.S. 162, 173-183 [90 L.Ed.2d 137, 147-154, 106 S.Ct. 1758]; *People* v. *Melton* (1988) 44 Cal.3d 713, 732 [244 Cal.Rptr. 867, 750 P.2d 741].)

### B. *The "Hit List"*

 Defendant contends that the admission of the so-called "hit list" was error. Prior to trial, he moved to suppress the list as seized in the course of a warrantless search. The prosecution opposed the motion, effectively arguing, inter alia, that the list was lawfully seized in conjunction with the booking process.

At the suppression hearing, the following facts were established. Upon defendant's arrest and booking at the Stanislaus jail following the Modesto liquor store robbery, several items, including an address book, were taken from his pockets by the police, inventoried, and placed in an envelope affixed with an inventory sheet. The next day, Stanislaus County authorities released defendant and the envelope to the custody of Detective Badiali of the Fresno Sheriff's Department.

Detective Badiali testified that he received custody of defendant at the Stanislaus jail and signed for the property envelope without inventorying its contents, and then transported defendant to the Fresno jail for booking. Prior to booking and in preparation therefor, he opened the envelope to "see if there was any contraband or narcotics, any money, that sort of thing, before I placed it with Mr. Hamilton's property in the Fresno County Sheriff's Department." He explained, "I had signed for something and this information or these properties in Stanislaus County and hadn't really inventoried the items that were in the envelope." On opening the envelope he found the address book. "As I went through the address book, I found a folded piece of paper that fell out of the address book. I unfolded it and saw names written on the address book on the page, separate page." He recognized the names and their evidentiary value, and turned the list over to the prosecution.

The court ruled that the seizure of the "hit list" was lawful and denied the motion to suppress.

Defendant claims that the court's ruling was erroneous. As we shall explain, the point must be rejected.

■ Warrantless searches are unreasonable per se, subject to only a few carefully circumscribed exceptions. (*People* v. *Dalton* (1979) 24 Cal.3d 850, 855 [157 Cal.Rptr. 497, 598 P.2d 467], and cases cited.) A "booking search"—i.e., a search "at the place of incarceration during the period of post-arrest detention" (2 LaFave, Search and Seizure (2d ed. 1987) § 5.3(a), p. 477 (hereafter LaFave))—is well recognized as one of those exceptions. (*Illinois* v. *Lafayette* (1983) 462 U.S. 640, 643-648 [77 L.Ed.2d 65, 69-73, 103 S.Ct. 2605]; *People* v. *Ross* (1967) 67 Cal.2d 64, 70 [60 Cal.Rptr. 254, 429 P.2d 606], revd. on other grounds *sub nom. Ross* v. *California* (1968) 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850]; see generally 2 LaFave, *supra*, § 5.3(a), pp. 477-487.) Although variously stated in our opinions (see *People* v. *Maher* (1976) 17 Cal.3d 196, 200-201 [130 Cal.Rptr. 508, 550 P.2d 1044], and cases cited), the purposes of, and justifications for, such a search are essentially two—to safeguard the arrestee's belongings and to promote jail security. The permissible scope of a booking search is broad: it may

"involve an item-by-item examination of everything in the arrestee's pockets or otherwise on his person, including looking into his wallet or into containers on the person; it may even extend to a strip search." (2 LaFave, *supra,* § 5.3(a), p. 482, fn. omitted; accord, *Illinois* v. *Lafayette, supra,* at pp. 646-647 [77 L.Ed.2d at p. 71].)

 In this case the evidence shows without dispute that Detective Badiali went through the items in the property envelope and found the "hit list" at the Fresno jail during the period of defendant's postarrest detention. Hence, the search was lawful and the list was properly seized. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 80-82 [241 Cal.Rptr. 594, 744 P.2d 1127].)

Defendant argues that there was no justification for a booking search at the Fresno jail and hence no justification for Detective Badiali's action. We are not persuaded. Even though the Stanislaus authorities made an initial inventory, the Fresno jailers could properly have conducted their own to ascertain—in the interests of both jail security and the safeguarding of property—that the envelope in fact contained those items and only those items listed on the inventory sheet.[2]

In conclusion, the admission of the "hit list" was not error.

C. *Motion to Recuse*

 Defendant contends the court erred in denying a motion to recuse the entire Fresno District Attorney's office from prosecuting his case. Prior to trial he made a recusal motion on the following facts. Dale Blickenstaff was the Fresno District Attorney, and Stephen Carlton was the assistant district attorney, Blickenstaff's second-in-command; Carlton represented Clarence Ray Allen at his 1977 trial and at that time had Blickenstaff as one of his law partners. At the hearing on the motion, Carlton testified he had not participated in any discussions or decisions concerning defendant's case. Normally, as assistant district attorney, he would take part in any decision to seek the death penalty. A day or so after the charged crimes, however, Blickenstaff advised him there appeared to be a possible connection between defendant and Clarence Ray Allen. As a result, he was excluded from any discussions concerning defendant's case. He admitted that during Allen's

---

[2] Defendant also argues that even if Detective Badiali's search could generally be justified under the rubric of a booking search, his opening of the address book was improper because the book constituted a "closed container" and as such was entitled to special Fourth Amendment protection. Defendant, however, "offered no such argument at [the suppression] hearing and may not do so for the first time on appeal." (*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640 [108 Cal.Rptr. 585, 511 P.2d 33].) In any event, the point is without merit. (See *People* v. *Miranda, supra,* 44 Cal.3d at pp. 81-82.)

1977 trial he might have discussed strategy with other members of his former firm, including Blickenstaff, but could not recall any specific discussions. He had had no contact with Allen or any member of his family since 1977.

The court denied the motion to recuse. It observed that Carlton's prior representation of Allen might present a problem if Allen were called to testify in defendant's case. It noted, however, that it was extremely unlikely that Allen would be called because he was expected to be charged with the same offenses as defendant. Accordingly, it concluded "there is no actual conflict, there is no impropriety and there is no appearance of impropriety."

Defendant attacks the ruling, contending that Penal Code section 1424 (hereafter section 1424), enacted in 1980, incorporates the common law principle stated in *People* v. *Superior Court (Greer)* (1977) 19 Cal.3d 255 [137 Cal.Rptr. 476, 561 P.2d 1164], to the effect that the court may recuse a district attorney from prosecuting a criminal charge when that official has an actual or potential conflict of interest that might prejudice him against the defendant. The Attorney General replies that section 1424 requires that the conflict be actual rather than merely potential, and that it be of such gravity as to render it unlikely the defendant would receive a fair trial unless recusal is ordered. He concludes that under his interpretation of the statute the ruling was proper.

█ Section 1424 provides in relevant part that a motion to recuse a district attorney "shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial." The showing must be especially persuasive when the defendant seeks to recuse an entire prosecutorial office and not simply a particular prosecutor. (See, e.g., *Love* v. *Superior Court* (1980) 111 Cal.App.3d 367, 371 [168 Cal.Rptr. 577] [decided under common law]; *Chadwick* v. *Superior Court* (1980) 106 Cal.App.3d 108, 115 [164 Cal.Rptr. 864] [same].)

In *Greer* we held that "a trial judge may exercise his power to disqualify a district attorney from participating in the prosecution of a criminal charge when the judge determines that the attorney suffers from a conflict of interest which might prejudice him against the accused and thereby affect, or appear to affect, his ability to impartially perform the discretionary functions of his office." (19 Cal.3d at p. 269.) Subsequent to *Greer,* the Legislature enacted section 1424. In *People* v. *Conner* (1983) 34 Cal.3d 141 [193 Cal.Rptr. 148, 666 P.2d 5], we recognized that the statute differs somewhat from the *Greer* rule. We held that under section 1424 it is immaterial whether the conflict is "actual" or only "apparent." "In our view a

'conflict,' within the meaning of section 1424, exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner." (*Id.* at p. 148.)

In determining whether a ruling on a motion to recuse was proper, a reviewing court applies the abuse-of-discretion standard. (*Love* v. *Superior Court, supra,* 111 Cal.App.3d at p. 371; *Chadwick* v. *Superior Court, supra,* 106 Cal.App.3d at p. 115; *People* v. *Battin* (1978) 77 Cal.App.3d 635, 671 [143 Cal.Rptr. 731, 95 A.L.R.3d 248].) This is so "Because the decision whether or not to disqualify is within the discretion of the [trial] court . . . ." (*People* v. *Battin, supra,* at p. 671.) Thus, just as the burden at the trial level is on the party seeking recusal (*Love* v. *Superior Court, supra,* at p. 372), so the burden on appeal is on the party complaining of the ruling.

Defendant argues that the prior relationship between Blickenstaff and Carlton and Clarence Ray Allen could have affected the objective and impartial consideration of his case. He asserts that Carlton's and Blickenstaff's knowledge of Allen's case could have affected their decision to pursue the "witness retribution" theory in his case. He further asserts that such personal knowledge could have affected the manner in which his case was prosecuted, including the decision to seek the death penalty. Thus, he concludes Carlton's former representation of Allen created at least the appearance of improper bias.

The protection of prosecutorial impartiality is, of course, a major purpose of the court's recusal power. (*Greer, supra,* 19 Cal.3d at pp. 266-267.) Even under section 1424, it may be appropriate to recuse an entire district attorney's office when there is substantial evidence that a deputy's animosity toward the accused may affect his colleagues. (*People* v. *Conner, supra,* 34 Cal.3d at p. 148.) Recusal may be denied, however, when the evidence of personal animus or bias is slight and does not amount to a reasonable possibility of unfairness. (See *Trujillo* v. *Superior Court* (1983) 148 Cal.App.3d 368, 373 [196 Cal.Rptr. 4]; *People* v. *Municipal Court (Henry)* (1979) 98 Cal.App.3d 690, 693 [159 Cal.Rptr. 639]; *People* v. *Battin, supra,* 77 Cal.App.3d at p. 672.)

Defendant advances no theory how Carlton's prior representation of Allen would have created such personal animosity toward him that the district attorney's office would have been unable to exercise prosecutorial discretion in an evenhanded manner. Neither Carlton nor Blickenstaff could have learned anything about defendant from Allen because Allen did not know defendant in 1977. The possibility that Carlton and Blickenstaff incurred such strong hostility to Allen in 1977 that Blickenstaff's judgment

about defendant was affected in 1980 seems insubstantial. Such a remote possibility could not "render it unlikely that the defendant would receive a fair trial." (Pen. Code, § 1424.)

Defendant unpersuasively argues that a newspaper report that Carlton was named on the "hit list" created the appearance of impropriety notwithstanding the fact that it was false and the district attorney's office knew it. Even under the *Greer* standard, the newspaper report would not compel recusal. Although the recusal power may be used to protect public confidence in the integrity and impartiality of the criminal justice system (*Greer, supra,* 19 Cal.3d at pp. 268-269; see *People* v. *Rhodes* (1974) 12 Cal.3d 180, 185-186 [115 Cal.Rptr. 235, 524 P.2d 363]), it is not necessary to take such a drastic step as recusal of an entire prosecutor's office in order to compensate for an erroneous newspaper report. Public confidence could be maintained with less extreme measures.[3]

Accordingly, we conclude that defendant has not carried his burden of showing that the court abused its discretion in denying his recusal motion.

### D. *Prosecutorial Intimidation of Defense Witness*

■ Defendant contends in substance that Callaway's testimony on behalf of the prosecution should have been stricken as the product of prosecutorial intimidation. The point must be rejected. Defendant did not challenge Callaway's testimony for the prosecution—including the threats made to Callaway's family—on the ground that it was the product of intimidation, but solely on the ground that the prosecution had failed to establish any connection between him and the threats. Thus the point is not preserved for review. (See Evid. Code, § 353, subd. (a).)

Citing *Webb* v. *Texas* (1972) 409 U.S. 95 [34 L.Ed.2d 330, 93 S.Ct. 351]; *Bray* v. *Peyton* (4th Cir. 1970) 429 F.2d 500, and *People* v. *Warren* (1984) 161 Cal.App.3d 961 [207 Cal.Rptr. 912], defendant argues that the contemporaneous-objection requirement should not preclude review. In each of these cases, however, the record fully set forth the actions or words on which the claim of intimidation was based; and in each case some form of objection was made so that there was an opportunity to develop all the facts

---

[3] Defendant contends the allegedly more restrictive standard of section 1424 violates principles of separation of powers to the extent it limits the authority granted by *Greer* to the courts to regulate judicial proceedings. We need not reach the constitutional claim. Nothing in the record shows the court believed its discretion was any narrower than *Greer* permitted; on the contrary, both parties and the court relied on *Greer* and other cases predating section 1424 as applicable precedents. In any event, even under *Greer* the ruling was not improper: Carlton's prior representation of Allen simply did not create an appearance of impropriety.

necessary to support or defeat a finding of intimidation. Here, by contrast, the record is devoid of evidence that the prosecution had in fact intimidated Callaway. For example, there is insufficient evidence to allow a determination whether the prosecution committed misconduct, i.e., "engaged in activity that was wholly unnecessary to the proper performance of [its] duties and of such a character as 'to transform [a defense witness]' " into a prosecution witness. (*In re Martin* (1987) 44 Cal.3d 1, 31 [241 Cal.Rptr. 263, 744 P.2d 374].) As a result of defendant's failure to raise the issue of intimidation at trial, the prosecution had no opportunity to present facts showing that it had not in fact intimidated Callaway. Accordingly, we are precluded from holding that the prosecution acted improperly.[4]

### E. Felony-murder Rule

Defendant contends that the felony-murder rule is invalid, and hence that his conviction for the murder of Rocha, White, and Schletewitz, which may have been predicated on the rule, must be set aside. The point is without merit: defendant attacks the felony-murder rule on grounds we held insufficient in *People v. Dillon* (1983) 34 Cal.3d 441, 462-476 [194 Cal.Rptr. 390, 668 P.2d 697].

### III. SPECIAL CIRCUMSTANCE ISSUES

### A. Felony-murder Special Circumstances

### 1. Failure to Instruct on Intent to Kill

■ Defendant contends that the felony-murder special-circumstance findings must be vacated because the court did not instruct that intent to kill was an element of that special circumstance. We do not agree.

As we held in *People v. Anderson, supra,* 43 Cal.3d at page 1147, "The court must instruct on intent to kill as an element of the felony-murder special circumstance when there is evidence from which the jury could find [citation] that the defendant was an aider and abetter rather than the actual killer." Here, all the evidence showed that defendant either actually killed Rocha, White, and Schletewitz, or was not involved in the crimes at all;

---

[4] Defendant claims that to the extent defense counsel's failure to object to Callaway's testimony on the ground of prosecutorial intimidation effected a waiver of the point, such failure amounted to ineffective assistance of counsel. The point must be rejected. The claim is predicated on the assertion that the prosecution did in fact attempt to intimidate Callaway. But as we have explained, that assertion is without adequate support in the record.

there was no evidence that he was an aider and abetter. Accordingly, the court did not err in failing to instruct on intent.[5]

### 2. *Failure to Instruct on Premeditation and Deliberation*

■ Defendant contends that the felony-murder special-circumstance findings must be vacated because the court did not instruct that premeditation and deliberation were elements of that special circumstance. We do not agree: the language and history of the statute establish beyond peradventure that premeditation and deliberation are not elements of the felony-murder special circumstance. Defendant argues that "the logic of the *Carlos* decision [*Carlos* v. *Superior Court, supra,* 35 Cal.3d at pp. 140-141] compels the conclusion that not only must intent to kill be established, but premeditation and deliberation as well." In *People* v. *Anderson, supra,* 43 Cal.3d 1104, however, we found the "logic" of *Carlos* on this point to be wanting. (*Id.* at pp. 1143-1144.) Accordingly, we reject defendant's argument.

### B. *Multiple-murder Special Circumstances*

### 1. *Failure to Instruct on Intent to Kill*

Defendant contends that the multiple-murder special-circumstance findings must be vacated because the court did not instruct that intent to kill was an element of that special circumstance. Again we do not agree.

■ As we implied in *People* v. *Anderson, supra,* 43 Cal.3d at page 1150, the court must instruct on intent with regard to the multiple-murder special circumstance when there is evidence from which the jury could find that the defendant was an aider and abetter rather than the actual killer. As stated above, there was no evidence that defendant was an aider and abetter. Accordingly, the court did not err in failing to instruct on intent.[6]

---

[5] Defendant claims that the application of *Anderson* rather than *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, is violative of the principles embodied in the ex post facto and due process clauses of the federal and state Constitutions. The point must be rejected. When, as here, the criminal act in question was done at a time at which the governing statute, Penal Code section 190.2, subdivision (a)(17)—not yet construed in *Carlos*—gave sufficient notice that intent to kill was not required for the actual killer, such conduct may be subjected to *Anderson* without offense to ex post facto and due process principles. (*People* v. *Easter* (1987) 197 Cal.App.3d 183, 185-187 [242 Cal.Rptr. 746].)

[6] Defendant claims that the application of *Anderson* rather than *People* v. *Turner, supra,* 37 Cal.3d 302, is violative of the principles embodied in the ex post facto and due process clauses of the federal and state Constitutions. For the reason we rejected a similar point dealing with the felony-murder special circumstance, we reject this point as well. (See fn. 5, *ante.*)

### 2. *"Multiple" Multiple-murder Special-circumstance Allegations*

■ Defendant correctly contends it was error for the prosecution to allege six multiple-murder special circumstances instead of one. As we explained in *People* v. *Anderson, supra,* 43 Cal.3d at page 1150: "The plain words of section 190.2(a)(3)—'The defendant has in this proceeding been convicted of *more than one* offense of murder'—suggest that no matter how many murder charges are tried together, they constitute a single multiple-murder special circumstance. That reading is supported by certain constitutional considerations: '. . . "alleging two special circumstances for a double murder improperly inflates the risk that the jury will arbitrarily impose the death penalty, a result also inconsistent with the constitutional requirement that the capital sentencing procedure guide and focus the jury's objective consideration of the particularized circumstances of the offense and the individual offender. [Citations.]" . . . [Accordingly,] appropriate charging papers should allege one multiple-murder special circumstance separate from the individual murder counts.' [Citation.]" It follows that five of the six multiple-murder special-circumstance findings must be vacated.

### IV. PENALTY ISSUES

Defendant raises several contentions going to the issue of penalty. As we shall explain, none is meritorious.

### A. *Issues Relating to "Other Crimes" Evidence*

Defendant makes a number of contentions relating to the introduction of evidence concerning the Modesto liquor store robbery. He first claims that evidence of other crimes not resulting in conviction is constitutionally inadmissible at the penalty phase of a capital trial. We rejected the point, however, in *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480].

■ Defendant next claims that the court erred by failing to instruct the jurors that they could consider the evidence of the liquor store robbery in aggravation only if they found that he had committed the crime beyond a reasonable doubt. We agree. (*People* v. *Robertson* (1982) 33 Cal.3d 21, 53-54 [188 Cal.Rptr. 77, 655 P.2d 279].) He then argues that the error was prejudicial. We cannot agree. In view of the fact that defendant faced overwhelming direct evidence of guilt and indeed did not actively contest the issue, we conclude that the error was nonprejudicial. (Cf. *People* v. *Miranda, supra,* 44 Cal.3d at pp. 97-98 [holding *Robertson* error harmless in a case in which there was "ample evidence, properly admitted, establishing" the defendant's guilt of the unadjudicated crime].)

Defendant also claims that the court was under a constitutional obligation to instruct the jurors that before they could consider the evidence of the liquor store robbery they had to agree unanimously that he had committed the crime. In *People* v. *Miranda, supra,* 44 Cal.3d 57, 99, however, we rejected essentially the same point.

Finally, defendant claims that the court was under a constitutional obligation to require the jury to return a written finding stating whether or not it found him guilty of the liquor store robbery. In *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203, however, we rejected the point.

B. *Issues Relating to the Instruction Pursuant to Penal Code Section 190.3*

Defendant contends the court erred in several particulars when it instructed the jurors, in accordance with Penal Code section 190.3 (hereafter section 190.3), on the factors they should consider in determining penalty.

Defendant first claims the court erred by refusing to delete "mitigating" factors unsupported by the evidence adduced at trial. Under *People* v. *Miranda, supra,* 44 Cal.3d at pages 104 and 105, however, the court's refusal was not error.

Defendant next claims that the court erred by instructing the jury as it did in accordance with factor (a) (the circumstances of the crime of which the defendant was convicted in the present proceeding), factor (b) (the presence or absence of criminal activity involving the use, attempted use, or threat, of force or violence) and factor (c) (the presence or absence of prior felony convictions).

He first argues that the court's instruction as to statutory sentencing factor (b) was error. In support he maintains that section 190.3 must be construed to limit the scope of that factor to crimes other than those of which the defendant was convicted in the capital proceeding. On this point we agree. (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 105-106.) He then maintains that the court's instruction did not so limit the scope of that factor and thereby permitted the "double-counting" of the same evidence by the jury. On this point, however, we disagree (see *id.* at p. 106) and hence reject the claim of error.

Defendant next argues that the court erred in giving factors (b) and (c) without qualification. Specifically, he maintains that in order to prevent the risk of double-counting, the statutory scheme established by section 190.3 must be understood to allow the trier of fact to consider evidence of a

single instance of violent criminal conduct resulting in a felony conviction under either factor (b) or factor (c) *but not both.* We cannot agree.

The trier of fact may properly consider such evidence under both factors for two independent purposes: i.e., to determine the defendant's propensity for criminal violence *and* his lack of response to deterrence. (*People v. Melton, supra,* 44 Cal.3d at pp. 764-765.) On request, the court should perhaps amplify on factors (b) and (c) and explain their interrelationship. But when as here no such request was made, the court is not under a duty to give an amplification or explanation sua sponte. (*People v. Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].)

■ Defendant also claims that the language of factor (k), combined with the prosecutor's argument, may have misled the jurors to his prejudice about the evidence they might consider in determining penalty. We agree.

Pursuant to section 190.3, the court instructed the jurors that in determining penalty they should consider several specified circumstances and also "(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

In *People v. Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], we concluded that the language of factor (k) might mislead jurors about the evidence they might consider, in violation of the federal Constitution as construed in *Lockett v. Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954], and *Eddings v. Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869], in which the United States Supreme Court held that the trier of fact may ". . . not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " (*Eddings, supra,* at p. 110 [71 L.Ed.2d at p. 8], quoting *Lockett, supra,* at p. 604 [57 L.Ed.2d at p. 990] (plur. opn. by Burger, C. J.).)

In *People v. Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nomine California v. Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], we stated that with respect to cases—such as the present—in which the jury had been instructed in the statutory language, we would examine each such appeal on its merits to determine whether the jury may have been misled. (40 Cal.3d at p. 544, fn. 17.) In conducting such an examination, we look to " 'the totality of the penalty instructions given and the arguments made to the jury' . . . ." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 786 [230 Cal.Rptr. 667, 726 P.2d 113].) If at the conclusion of our examination we are of the opinion that the jury may have been misled, we must hold that error of federal constitutional

dimension has occurred. (*California* v. *Brown, supra,* 479 U.S. at p. 546 [93 L.Ed.2d at p. 943, 107 S.Ct. at p. 842] (conc. opn. of O'Connor, J.); see, e.g., *People* v. *Hendricks* (1988) 44 Cal.3d 635, 651 [244 Cal.Rptr. 181, 749 P.2d 836]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 777 [239 Cal.Rptr. 82, 739 P.2d 1250].)

We apply this test to the case at bar. As stated above, the court instructed the jury pursuant to the potentially misleading language of factor (k). In turn, the prosecutor's argument—as will appear—did nothing to cure, but actually exacerbated, the instruction's potential to mislead: he told the jury in essence that defendant's mitigating evidence was simply irrelevant.

After discussing the other penalty factors, the prosecutor addressed factor (k): "Number eleven, any other circumstances [*sic*] which extenuates the gravity of the crime even though it is not a legal excuse for the crime. Is there any justification or excuse offered on behalf of the defendant for why this crime occurred? Obviously there is not. *The evidence presented by the defendant this morning goes not to any of these eleven guidelines.* What you heard this morning was evidence from people who knew the defendant well twelve years ago. None of these people knew the defendant or were with the defendant at or about the time these crimes were occurring." (Italics added.)

The prosecutor continued: "In listening to those guidelines the Court has read to you, there are no circumstances in mitigation. *What was presented to you this morning does not apply to any of the guidelines the Court is going to read to you* . . . . [T]hat's all you're going to be basing your decision on. That's what makes your decision easy in this case is that there are no circumstances in mitigation." (Italics added.)

The prosecutor then stated, "[If] defense counsel['s] . . . arguments . . . don't fit into any of those guidelines, then they are not a basis for consideration in making your decision in this case." Immediately thereafter the prosecutor said his final words to the jury and reiterated, "There are no circumstances in mitigation."

In a word, as the Attorney General himself conceded at oral argument, "The prosecutor *did* argue that there was no mitigating evidence."

Thus, far from dispelling the notion that the jury's sentencing discretion and responsibility were confined by the potentially misleading language of factor (k), the prosecutor capitalized on that language and exacerbated its potential for misleading the jury in this crucial respect.

Accordingly, we are of the opinion that the jurors may have been misled about the evidence they might consider in fixing penalty, and hence conclude that error of federal constitutional dimension occurred.

The Attorney General argues that the court cured the harm threatened by factor (k) by giving a definition of the term "mitigating." During deliberations, the jury asked the court to reread the penalty instructions three times. The third time, they added the following request: "Please read all of the instructions again explaining mitigating and aggravating circumstances. Can you give us additional definitions of these words in layman's terms?" In response, the court gave the following definitions from Black's Law Dictionary: "Aggravation. Any circumstance attending the commission of a crime which increases its guilt or enormity or adds to its injurious consequences, but which is above and beyond the essential constituents of the crime itself. [¶] I will next define 'mitigating.' [¶] Circumstances such as do not constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability." The court then cautioned the jury: "*Now, you should understand that those two definitions were not intended to in any way alter the original instructions that I gave you,* they were simply in response to your question to further clarify what is meant by those words that were used in my instructions." (Italics added.)

We are not persuaded that the court's brief answer to the jury's query cured the harm threatened. Factor (k) was presented to the jury time and again: it was quoted and emphasized extensively by the prosecutor in his argument, delivered by the court in the penalty instructions, and reread three times during deliberations. The court's definition of "mitigating," by contrast, was given but once. More important, the jury could not reasonably have taken the court's answer to expand the scope of factor (k): the court expressly warned the jurors that its supplemental definitions "were not intended to in any way alter the original instructions that I gave you . . . ."

The Attorney General argues that the error was harmless. At the threshold we must determine the proper standard of review for prejudice. As we have explained, the error here is of federal constitutional dimension. As such, it is subject to review under the beyond-a-reasonable-doubt test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], if it falls within the scope of the general rule, or is reversible per se, if it falls within an exception. (*Satterwhite* v. *Texas* (1988) 486 U.S. 249, __-__ [100 L.Ed.2d 284, 108 S.Ct. 1792, 1797-1798].) In *Hitchcock* v. *Dugger* (1987) 481 U.S. 393 [95 L.Ed.2d 347, 107 S.Ct. 1821], the United States Supreme Court suggested that the kind of error under consideration here is subject to review under the *Chapman* test. (See

*id*. at pp. 398-399 [95 L.Ed.2d at p. 353, 107 S.Ct. at p. 1824] [the judge instructed an advisory sentencing jury not to consider, and himself refused to consider, certain mitigating evidence proffered by the defendant].) Accordingly, we shall apply that test until the court directs us to do otherwise.

Even under *Chapman,* we are compelled to agree with the Attorney General's claim that the error was nonprejudicial. As our summary of the proceedings at the guilt and penalty phases of the trial reveals, the evidence in aggravation was overwhelming and the evidence in mitigation was minimal. In these circumstances, we are of the opinion that the error was harmless beyond a reasonable doubt.

## C. *Brown Error*

■ Defendant contends that the pre-*Brown* CALJIC No. 8.84.2 instruction incorporating the section 190.3 mandatory sentencing language (hereafter former CALJIC No. 8.84.2), which was given in this case, may have misled the jurors to his prejudice as to the scope of their sentencing responsibility and discretion. (*People* v. *Brown, supra,* 40 Cal.3d at pp. 538-544.)

Although in *Brown* we held that the sentencing provision was not unconstitutional in itself (40 Cal.3d at pp. 538-544), we nevertheless recognized that when delivered in an instruction the unadorned statutory language might mislead the jurors as to the scope of their discretion and responsibility to the defendant's prejudice (*id*. at p. 544, fn. 17). With respect to cases—such as the present—in which the jury had been instructed in the statutory language, we announced that we would examine each such appeal on its merits to determine whether the jury may have been misled. (*Ibid*.)

Our concerns in *Brown* were essentially two. The first was that the unamplified language of section 190.3 might mislead the jury as to the nature of the weighing process. "In . . . [its] context, the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider . . . ." (40 Cal.3d at p. 541.)

Our second concern was that the statutory language might mislead the jury as to the substance of the ultimate determination it was called on to make. Contrary to constitutional principles, that language "could be under-

stood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances . . . ." (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115] (lead opn. by Grodin, J.).) In *Brown* we declared that the statutory language should rather be interpreted to require that the jury make " '. . . an individualized determination on the basis of the character of the individual and the circumstances of the crime' " (40 Cal.3d at p. 540, italics deleted), and thereby decide "which penalty is appropriate in the particular case" (*id*. at p. 541).

We turn now to the case at bar. After reviewing the record of the penalty phase in its entirety, we cannot conclude that the jurors may have been misled to defendant's prejudice by former CALJIC No. 8.84.2. We believe that they were adequately informed as to what they were to do, and how they were to proceed, in the determination of penalty.

Defendant argues in substance that the prosecutor's closing argument made the potentially misleading language of former CALJIC No. 8.84.2 misleading in the context of this case. We are not persuaded.

The theme of the prosecutor's argument, which was repeated time and again, was that the evidence in aggravation was overwhelming and the evidence in mitigation was nonexistent—and hence that the *evidence* called for the penalty of death. Such a theme, of course, does not offend the principles of *Brown*.

We recognize that at the beginning of his argument the prosecutor paraphrased the mandatory sentencing language: "His Honor is going to instruct you that after having heard all the evidence and those instructions if you determine that the aggravating circumstances outweigh the mitigating circumstances, then you shall impose the sentence of death. If, on the other hand, you determine that the mitigating circumstances outweigh the aggravating circumstances, then you shall impose the sentence of life without possibility of parole." We also recognize that toward the end of his argument he returned to the point: "The Court will instruct you that after having heard these guidelines, if the circumstances, the factors in aggravation outweigh, and again you are not looking at anything beyond a reasonable doubt, that's a different standard. You have a scale in front of you. One is for aggravation and one is for mitigation. If the scale tips towards mitigation, then you are bound by law to impose the sentence of life without possibility of parole. But if on the other hand that scale tips at all towards

the factors in aggravation outweighing the circumstances in mitigation, then you are bound by law to impose the sentence of death in this case."

Nevertheless, we do not believe that these comments made the language of former CALJIC No. 8.84.2 misleading in the context of this case. This is so because when the argument is considered as a whole these remarks appear relatively short, isolated, and unemphatic and hence are swallowed up in the theme that the evidence called for the penalty of death. In conclusion, on this record we find no *Brown* error.

### D. *"Burden of Proof" in Determining Penalty*

Defendant contends that the court was under a constitutional obligation to instruct the jurors that they might return a verdict of death only if they were persuaded beyond a reasonable doubt that the evidence in aggravation outweighed the evidence in mitigation and that death was the appropriate penalty. We rejected the point, however, in *People* v. *Rodriguez, supra,* 42 Cal.3d at pages 777-779.

### E. *"Multiple" Multiple-murder Special Circumstances*

Defendant contends that it was prejudicial error for the court to direct the jury to consider six multiple-murder special-circumstance findings instead of one. We agree that the court erred. (See *ante,* pt. III. B. 2.) We cannot agree, however, that the error requires reversal. Although we presume that the jurors considered the invalid special-circumstance findings independent of their underlying facts, we cannot conclude that they could reasonably have given them any significant independent weight.

### F. *Issues Relating to Guilt Phase Instructions*

#### 1. *CALJIC No. 1.00*

Defendant contends in substance that the court erred by failing to advise the jurors that in fixing penalty they should not be guided by the last paragraph of CALJIC No. 1.00, which was given at the guilt phase. That portion of the instruction is as follows.

"You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be."

At the threshold defendant claims in substance that the jurors could have carried this guilt phase instruction over to the penalty phase. For purposes of discussion we shall agree.

Defendant then claims that the instruction subjected him to prejudice. Specifically, he maintains that its "no-sympathy" injunction interferes with the jury's exercise of its constitutional duty to consider any relevant mitigating evidence offered by the defendant as a basis for a sentence less than death, whether such evidence relates to the offense or to his background and character. He further maintains that the "regardless-of-consequences" injunction of the instruction undermines the sense of responsibility with which the Constitution requires the jury to proceed in making its determination of penalty.

In *California* v. *Brown, supra,* 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], however, the United States Supreme Court expressly held that the "no-sympathy" injunction of CALJIC No. 1.00 was not erroneous in and of itself. (*Id.* at pp. 542-543 [93 L.Ed.2d at p. 940, 107 S.Ct. at pp. 839-840].) Similarly, in *People* v. *Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279], we impliedly held as much with respect to the "regardless-of-consequences" injunction of the same instruction. (*Id.* at pp. 442-443.)

Nevertheless, in *People* v. *Brown, supra,* 40 Cal.3d 512, 536-537, and subsequent decisions, we have recognized that in certain cases the language of the last paragraph of CALJIC No. 1.00 might indeed be understood by jurors as defendant fears and, if so understood, might fatally taint their verdict. But having reviewed the record in its entirety, we find no such taint here. First, there is no reason to believe that in this case the "regardless-of-consequences" injunction undermined the jurors' sense of responsibility. Indeed, in rejecting defendant's claim of *Brown* error we expressly concluded that the jurors were adequately informed as to what they were to do, and how they were to proceed, in the determination of penalty. (See *ante,* pt. IV. C.) Second, the "no-sympathy" injunction—even if it did in fact lead the jurors not to consider defendant's background and character evidence—could not have been prejudicial. As we concluded in resolving defendant's claim of *Easley* "factor (k)" error, the misleading of the jurors on this point must be deemed harmless beyond a reasonable doubt. (See *ante,* pt. IV. B.)

Accordingly, we hold that the last paragraph of CALJIC No. 1.00 did not subject defendant to prejudice.[7]

---

[7] Recognizing, as we do, that in certain cases the last paragraph of CALJIC No. 1.00 might mislead jurors to the defendant's prejudice, we adhere to our statement in *People* v. *Brown, supra,* 40 Cal.3d at page 537, footnote 7: "this portion of CALJIC No. 1.00 should never be given in a capital penalty trial."

### 2. CALJIC No. 2.20

Defendant contends in substance that the court erred by failing to instruct the jurors, sua sponte, in accordance with CALJIC No. 2.20 ("Credibility of Witness"), as it had instructed them at the guilt phase. Assuming for argument's sake that the court did indeed err by failing to reinstruct the jurors on this point or at least advise them that the instruction delivered at the guilt phase was applicable to their penalty phase deliberations, we believe that the court did not subject defendant to prejudice. Having reviewed the record of the penalty phase in its entirety, we are of the opinion that in the absence of the claimed error the outcome would have been the same.

### 3. CALJIC Nos. 2.60 and 2.61

Defendant contends in substance that the court erred by failing to instruct the jurors, sua sponte, in accordance with CALJIC No. 2.60 ("Defendant Not Testifying—No Inference of Guilt May Be Drawn") and CALJIC No. 2.61 ("Defendant May Rely on State of Evidence"), as it had instructed them at the guilt phase. In *People* v. *Preston* (1973) 9 Cal.3d 308 [107 Cal.Rptr. 300, 508 P.2d 300], however, we clearly, albeit impliedly, rejected the point with regard to the substantially similar predecessors of these instructions. (*Id*. at p. 316.) Defendant argues that we should limit the *Preston* holding to its factual setting, i.e., the trial of guilt or innocence. He fails, however, to provide any reason or authority that would compel us to do so either as a general matter or on the facts of this case.

### G. The Court's Response to a Question Asked by the Jury

■ Defendant contends that a response given by the court to a question asked by the jury during deliberations amounts to prejudicial error. To properly address the point, we must place the response under challenge in its context.

Following the prosecutor's closing argument, defense counsel opened his with the following statement: "Ladies and gentlemen, . . . I would point out to you at this point that if you did absolutely nothing at this time, Mr. Hamilton spends the rest of his life in prison. That's the law." Reiterating that statement, counsel closed as follows. "[A]s I said in the beginning, that if you do absolutely nothing now, Billy Hamilton goes to prison for the rest of his life until he dies. . . . He will be within those walls for the rest of his life. That's what I am asking you to do. I am asking you to in effect do nothing and let Billy Ray Hamilton stay behind the walls of that prison for the rest of his life. I think nothing can be done by going ahead with the request of the District Attorney and asking you to pull the lever that

releases the pellet because that too would be an outrage and I don't want you to commit an outrage. Thank you, ladies and gentlemen."

As the jury was being excused at the end of the first day of deliberations, the following colloquy ensued between the court and the jury foreman, David McCauley.

"THE COURT: . . . Well then, I am going to excuse the jury at this time and ask that you all return at ten o'clock sharp. . . . The jury is—yes, sir?

"MR. MCCAULEY: Some of us had asked the question as to whether you could say anything about what would happen if we were not to reach a decision.

"THE COURT: Well, let me suggest this to you, since I want to have a chance to show your inquiry to the attorneys before I answer it, why don't you, in the morning, if you want, write out a note that you have in mind as to what the jury is asking and then I don't know if I am going to be able to answer your question or not, but you certainly have a right to ask me any question that's bothering the jury and I will do my best to help you if I can.

"MR. MCCAULEY: Okay.

"THE COURT: All right. The jury is excused until ten o'clock tomorrow morning. . . ."

On the second day of deliberations, the jury sent the court a note with the following question: "What would the law of the State of Calif. require you (the court) to do if the jury is undecided on the penalty phase of this trial?" The court responded: "The best answer that I can give you is this, you shouldn't concern yourself with the consequences if the jury is unable to reach a verdict on the penalty phase of the case. That is a matter which shouldn't enter into your consideration. You should continue deliberating for as long as you feel it to be productive and I will be glad to help you in any way that I can in your deliberations."

Later that day, the jury sent the court another note: "The defense attorney stated that . . . 'if we do nothing Billy Ray Hamilton will go to prison for life.' Is that statement true?" As the court directed itself to that question, there ensued the following colloquy, in which the response defendant now challenges is contained.

"[THE COURT:] I will answer your question but first let me ask, did you interpret that or did someone on the jury, Mr. McCauley, interpret that to mean by if we do nothing that if we do not agree upon a verdict—

"MR. MCCAULEY: Yes.

"THE COURT: Well—

"MR. MCCAULEY: That's what we—

"THE COURT: I think the problem is that you misinterpreted what [defense counsel] said or meant. And his argument was entirely proper and what he argued was that if the jury did not impose the death penalty in their verdict but instead selected the other alternative, that he would still be imprisoned in a state prison for the rest of his life. He did not argue *nor would it be true that he would automatically go to prison for life if the jury did not agree upon a verdict.* You see the distinction that I make, Mr. McCauley?

"MR. MCCAULEY: Yes.

"THE COURT: All right. Does that answer the question that the jury had?

"MR. MCCAULEY: Yes, it does. One additional item. We expect to reach a decision within fifteen or twenty minutes.

"THE COURT: Very well. I am glad you alerted that, alerted us to that. So the jury may now retire and resume their deliberations." (Italics added.)

Shortly thereafter, the jury returned with a verdict of death.

Defendant claims that the italicized portion of the court's response to the jury's question was objectionable. In support he first argues that the statement invited the jurors to consider matters foreign to their task of determining whether death was the appropriate penalty in this case.

As defendant himself acknowledges, the success of his argument depends on how a reasonable juror would have interpreted the court's response. We believe that such a juror would have understood the statement as we do—i.e., it is not the case that if the jury were irreconcilably divided defendant would automatically be sentenced to life imprisonment without possibility of parole. Interpreted in this fashion, the statement is of course correct. Penal Code section 190.4, subdivision (b), provides in relevant part: "*If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and shall order a new jury impaneled to try the issue as to what the penalty shall be.* If such new jury is unable to reach a unanimous verdict as to what the penalty shall be, the court in its discretion shall either order a new jury or impose a

punishment of confinement in state prison for a term of life without the possibility of parole." (Italics added.) We also believe that a reasonable juror would have found nothing else in the statement—certainly not the invitation to speculate on irrelevant matters that defendant claims he has discovered.

In reliance on *United States* v. *McCracken* (5th Cir. 1974) 488 F.2d 406, defendant next argues in substance that it was improper for the court to give even a correct answer to the jury's question on the consequences of failure to reach a verdict. *McCracken,* however, is inapposite. In that case the court held only that it was error for the trial judge to inform jurors, in the general charge, of the consequences of a verdict of not guilty by reason of insanity. (*Id.* at pp. 424-425.) It did not state or imply that it was error to answer a question on the matter raised by the jurors. In any event, the law in this state is contrary to defendant's position. (Cf. *People* v. *Ramos* (1984) 37 Cal.3d 136, 159, fn. 12 [207 Cal.Rptr. 800, 689 P.2d 430] [question by jury on commutability of sentences of death and life imprisonment without possibility of parole].)

In conclusion, we are of the opinion that the court's response was not objectionable, and hence reject defendant's point.[8]

### H. *Cumulative Prejudice*

Defendant contends that, considered together, the penalty phase errors in this case require reversal. We do not agree. Even when his life is at stake, " '[a] defendant is entitled to a fair trial but not a perfect one.' " (*Schneble* v. *Florida* (1972) 405 U.S. 427, 432 [31 L.Ed.2d 340, 345, 92 S.Ct. 1056].) From our review of the record we are convinced that defendant did indeed receive a fair trial on the issue of penalty.

### I. *Ruling on Application for Modification of Verdict of Death*

Defendant contends that the court committed prejudicial error in ruling on his application for modification of the verdict of death pursuant to Penal Code section 190.4, subdivision (e). Specifically, he argues that the court (1) improperly considered the absence of mitigating evidence going to diminished capacity under section 190.3 to be evidence in aggravation, and (2) refused to consider the background and character evidence he had presented in the erroneous belief that such evidence was immaterial. To support his

---

[8] *Defendant argues in substance that the court's response preceded the verdict by only minutes and hence must be deemed its cause. But because we have concluded that the response was not objectionable, we believe that the claimed causal connection is immaterial for the purpose of determining error or prejudice.*

point, defendant refers us to the court's comments at the verdict-modification hearing[9] and the minute order relevant to that proceeding.[10]

For argument's sake, we shall agree with defendant that the court erred as he claims it did. We cannot agree, however, that the claimed error was prejudicial: in view of the overwhelming evidence in aggravation and the minimal evidence in mitigation, the claimed error was harmless under any standard.

## J. *Constitutionality of the 1978 Death Penalty Law*

Defendant contends the 1978 death penalty law is unconstitutional on a variety of grounds. In *People* v. *Rodriguez, supra,* 42 Cal.3d at pages 777-779, we rejected the very point made here.

---

[9]The court's comments were in relevant part as follows.

"THE COURT: Well, as the trial Judge, there are many things that I perhaps could and would like to say at this time but I think saying any of them would serve no useful purpose. So I am going to confine myself to those findings that I am required to make under the law. And I am aware of the fact that under 190.4(e) of the Penal Code that I have certain obligations and I have fulfilled them. I have reviewed the evidence, I have considered and will be guided by the aggravating and mitigating circumstances set forth in Section 190.3 and I make as is my responsibility a determination as to whether the jury's finding that the aggravating circumstances outweighed the mitigating circumstances, is or isn't contrary to the law. I have carefully reviewed all of the mitigating and aggravating circumstances set forth in 190.3 and I find that without exception all the aggravating circumstances are applicable and except for those that by their very nature have no application at all to this case, and that there is in fact from this record and what's before me, no mitigating circumstances. I am going to in particular refer to aggravating factors (a), (b) and (h) in my review of the aggravating circumstances. And with reference to (a), these are unprovoked, cold, calculated, premeditated, vicious murders without parallel in my experience. With reference to (h), there is nothing about the capacity of the defendant that would prevent him from appreciating the criminality of his conduct. There is no evidence of diminished capacity or intoxication at the time of this offense. I do not find an unhappy childhood, which certainly was the case, to be any justification or mitigating circumstance. And in summary, I find that there is ample evidence to support the jury's verdict in all particulars.

". . . I am not going to belabor this except to say that in my opinion any other decision that I would make would be shirking my responsibility and that whatever my personal feelings may be about the death penalty is not controlling in this case."

[10]The minute order states in pertinent part as follows. "The Court finds that all the aggravating circumstances contained in Penal Code section 190.3 are applicable except for those that by their very nature have no application to this case, and that there is in fact from this record no mitigating circumstance. The Court in particular refers to aggravating factors in paragraphs (a), (b), and (h). With reference to paragraph (a), these are unprovoked, cold, calculated, premeditated, vicious murders. With reference to (h), there is nothing about the capacity of the defendant that would prevent him from appreciating the criminality of his conduct. There is no evidence of diminished capacity or intoxication at the time of this offense. Unhappy childhood is not a mitigating circumstance. There is ample evidence to support the jury's verdict in all particulars."

## K. *Comparative Proportionality Review*

Defendant urges us to undertake comparative (or intercase) proportionality review of the sentence of death. Because the United States Constitution does not require such review (*Pulley* v. *Harris* (1984) 465 U.S. 37, 39, fn. 1, 42-54 [79 L.Ed.2d 29, 33, 35-43, 104 S.Ct. 871]) and defendant fails to set forth compelling reasoning or authority in support, we decline his request.

## L. *Enmund Finding*

 Finally, we are of the opinion that in view of the theories presented and the evidence introduced, the jury's guilt phase verdicts imply a finding that defendant was the actual killer (*Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368]). Having reviewed the record in its entirety, we conclude that this finding is amply supported by the evidence and adopt it as our own. Accordingly, we hold that the imposition of the penalty of death on defendant does not violate the Eighth Amendment. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716, 106 S.Ct. 689].)

The judgment is affirmed.

Lucas, C. J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.,** Concurring and Dissenting.—I concur in the majority's affirmance of guilt and, under compulsion of *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], in the finding of special circumstances. I dissent to the imposition of the death penalty.

At the conclusion of the penalty trial the prosecutor told the jury, erroneously, that they could not consider any of the defendant's mitigating character and background evidence because it did not relate to the statutory aggravating or mitigating factors. Because this argument raises a legitimate question whether the jury performed its constitutional obligation to consider the mitigating evidence in arriving at its verdict, the majority hold that federal constitutional error has occurred.[1] (*Ante,* p. 146.) The trial judge repeated the prosecutor's error when, in ruling on the motion to modify the verdict, he concluded that defendant's evidence of his unhappy upbringing was not mitigating evidence. (*Ante,* p. 156-157.)

---

[1] This is also substantial error under California law. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878-880 [196 Cal.Rptr. 309, 671 P.2d 813].)

The cited errors represent a particularly serious form of error. In the present case, as in most penalty trials, defendant's only hope is to introduce evidence which may lead the jury or judge to understand the circumstances that molded his character, to sympathize with his personal struggle, or to find in him some redeeming conduct or quality. If the jury hears no such evidence or, hearing it, is told not to consider that evidence, the result of the penalty trial is inevitable. Such a trial does not determine whether death is the appropriate penalty, but functions only as a ritual on the road to execution.

The majority opinion recognizes the seriousness of the errors. Its author, in *People* v. *Deere* (1985) 41 Cal.3d 353, 368 [222 Cal.Rptr. 13, 710 P.2d 925], wrote that "[w]hen the sentencer in a capital case is deprived of all or a substantial part of the available evidence in mitigation, 'the potential for prejudice is too obvious to require proof.' [Citation.] Indeed, 'short of substituting a verdict of its own, there is no way for a reviewing court to determine what effect unpresented mitigating evidence might have had on the sentencer's decision.' [Citation.] We have no doubt that a judgment of death imposed in such circumstances constitutes a miscarriage of justice. (Cal. Const., art. VI, § 13): not only did defendant not have a fair penalty trial—in effect he had no penalty trial at all."

Much the same can be said of the present case. Surely we would not want to make much of the distinction between a case in which the jury heard no mitigating evidence, and one in which they were told to disregard all such evidence. The only difference between this case and *Deere, supra,* 41 Cal.3d 353, is that in *Deere* the jury could not have considered the mitigating evidence because they did not hear it; here it is possible, although unlikely, that the jury did consider that evidence, contrary to the prosecutor's admonition. The distinction, in other words, is between a case in which the defendant *was* deprived of a fair penalty trial and one in which the defendant *was probably* deprived of that right—but both cases should be reversed for a new penalty trial.

The majority, however, conclude that these serious errors are not reversible under the beyond-a-reasonable-doubt test of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].[2] Billy Ray Hamilton, they imply, is so evil, so depraved a person that no reasonable juror—not even one generally opposed to capital punishment and sensitive to the social conditions which impel some persons to crime—could be moved by Hamilton's evidence to spare his life. To the extent this assertion

---

[2] Like the majority, I am uncertain whether the United States Supreme Court intends the *Chapman* test to apply to error of the kind here at issue. (See discussion in majority opn., *ante,* p. 148.) Perhaps that court will clarify its position in this or some other case.

represents a statement about juror behavior and not just the personal views of the majority, it has no support in reasoning or data. So far as I am aware, there have been no studies of jury decisions under the 1978 death penalty law. This court sees all the cases in which juries impose the death penalty, but very few of those in which the jury chooses life imprisonment. For all we know there may be many cases comparable to the present case in which juries, persuaded by the mitigating evidence, vote against the death penalty.

We also lack knowledge about judicial rulings on motions to modify. We review on automatic appeal only those cases in which the court denies the motion, and do not know how often, and upon what grounds, judges grant such motions. In this respect the rulings resemble the penalty verdict itself. But such rulings differ from verdicts in one critical respect: when we consider a judge's ruling on the motion to modify, there is no reason to tolerate any degree of ambiguity. A remand for a new modification hearing, in contrast to a new trial, involves minimal judicial resources and minimal delay. There is no reason to guess as to whether the trial judge considered the mitigating evidence, or whether it would have made a difference if he had considered it. We can send the case back, direct him to consider it, and find out if it makes any difference.

The one thing we should not do is to affirm a death penalty despite substantial error which probably deprived defendant of both a fair penalty trial and a considered ruling on the motion to modify.

Appellant's petition for a rehearing was denied September 22, 1988.