Filed 7/7/15  P. v. Wildman CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL CHARLES WILDMAN,<br><br>    Defendant and Appellant. | 2d Crim. No. B254560<br>(Super. Ct. No. 2010035171)<br>(Ventura County)<br>MODIFICATION OF OPINION<br>No Change In Judgment |

THE COURT:

The opinion filed herein on June 18, 2015, is modified as follows:

On page 7, line two between the words "did" and "urge" insert the word "not."  The sentence will then read:  He did not urge the jury to base its decision on facts not presented . . . .

NO CHANGE IN JUDGMENT

Filed 6/18/15  P. v. Wildman CA2/6 (unmodified version)
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL CHARLES WILDMAN,<br><br>    Defendant and Appellant. | 2d Crim. No. B254560<br>(Super. Ct. No. 2010035171)<br>(Ventura County) |

Daniel Charles Wildman appeals his conviction, by jury, of the first degree murder (§§ Pen. Code, 187, subd. (a), 189)[1], of Darren Ziegler, and of being a felon in possession of a firearm.  (§ 12021, subd. (a)(1).)  The jury further found that appellant personally and intentionally discharged a firearm in committing the murder.  (§ 12022.53, subd. (d).)  The trial court sentenced appellant to a total term of 50 years to life in state prison.

Appellant contends:  1. the trial court erred when it refused to limit the prosecutor's use of the word "murder;"  2. appellant was denied a fair trial when the trial court admitted evidence of his nine  prior felony convictions and of his uncharged misconduct in selling and using methamphetamine and in physically abusing his former girlfriend, Paula Napoli; 3. the trial court erred when it instructed the jury that it could

---

[1] All statutory references are to the Penal Code unless otherwise stated.

1

consider appellant's prior felonies in determining his intent, motive or plan to kill Ziegler; 4. the trial court erred in its instructions to the jury regarding self-defense and imperfect self-defense; 5. the trial court erred when it instructed the jury, in terms of CALCRIM No. 361, regarding appellant's failure to explain or deny incriminating evidence; 6. defense counsel at trial rendered ineffective assistance when he failed to object to the improper jury instructions; and 7. the cumulative effect of these errors requires reversal. We affirm.

*Facts*

Appellant was a methamphetamine dealer. In 2006, he began a dating relationship with one of his customers, Paula Napoli. By 2010, their relationship soured. The couple fought frequently and sometimes violently. On one occasion in 2010, appellant spit in Napoli's face, knocked her to the ground and shook her shoulders, causing her head to hit the concrete beneath her. During other fights, he stabbed her in the ear with a key, poked her in the eye, sprayed brake cleaner on her and ripped a necklace from her neck. In June 2010, appellant sprayed Napoli with pepper spray. He also injured her by stepping on her foot while he was wearing boots.

Appellant became friends with Darren Ziegler in 2005. Ziegler, who worked as an auto mechanic, bought methamphetamine from appellant. The two men also worked on cars together. Their friendship ended in 2008 or 2009 after Ziegler accused appellant of selling him substandard drugs. Appellant stopped selling drugs to Ziegler or spending time with him socially.

As the relationship between Napoli and appellant deteriorated, she started dating Ziegler and using drugs with him. Soon, she was seeing both men at the same time. Appellant told Napoli that she was betraying him and being disrespectful to him when she dated Ziegler. According to Napoli, appellant called Child Protective Services and reported that she was using drugs while her young daughter was in the house. He also tried to have Napoli's rent subsidy revoked. Appellant told Napoli that, if he could not be with her, no one could. He threatened to kill Napoli, her young daughter, Ziegler and himself.

2

In August and September, appellant sent Napoli many threatening text messages. One message said, "You're a cold person and a bullshit parent, just like your birth mom. And remember, I don't threaten you. Everything I say I do. Unlike you who threaten and manipulate. . . . And I know you're afraid of what's going to happen. I would be too. But that's what happens when people betray." Another said, "For both our sakes you best not be seeing that fucker . . . . That would unleash a can of worms neither one of us wants to deal with." Appellant later sent a message saying, "I'm gonna do us both a favor. I'm taking him with me. . . . He started it like a bitch. I'm finishing it."

Appellant also exchanged threatening text messages with Ziegler. In one message, appellant told Ziegler, "There's no fight in my heart. All I taste is death. One of us has got to stop breathing. And I ain't afraid of death. I invite it. [¶] If you didn't learn one thing about me then you are stupid. Fear is for pussies. And if you ever thought I was a pussy you don't have half the brain you think you do. I am a killer. Give me a chance to shine." After appellant challenged Ziegler to meet him in an isolated, semi-rural area to fight, Zielger texted back, "I don't give a fuck about you or your business. You're an abusive, manipulative, arrogant liar. And dope has made you even worse off . . . . [¶] Let's [come] up with a more neutral area during the day. No pussy pepper spray. No billy clubs. No guns. No bullshit. No people. Just you and me."

On the weekend before the murder, September 25 and 26, 2010, Ziegler took Napoli's car to his work shop, leaving his own car in Napoli's driveway. On September 26, appellant sent Napoli a text message asking if Ziegler could "come out to play[.]"

At about noon the next day, September 27, appellant called Napoli. He wanted to meet with her and said that if she did not, he was going to kill her. Napoli refused to meet appellant. Appellant called back a few hours later, offering to meet her in a public place. She again refused. Appellant told Napoli, "if he was gonna go down, that he was gonna take [Napoli] with him."

At 12:45, between the two calls to Napoli, appellant sent a text message to Ziegler that said, "Oh nigger, don't forget. You promised me we were going to make

3

sweet love. If not here Hawaii will do. You stepped way over the line, and you know better. There's no excuse. Time to be the man you claim to be. Or are you going to disappoint me again?"

Several hours later, around 5:10 p.m., appellant drove to Ziegler's work shop in Thousand Oaks and revved his engine in the parking lot. Ziegler, who had been working on a car, walked outside of his shop at his normal pace toward appellant's car. Numerous witnesses testified that Ziegler had his arms at his sides and nothing in his hands. When Ziegler was about 30 feet away, appellant fired one shot at him but missed. Appellant was standing behind the open, driver's side door of his car. Ziegler took two more steps toward appellant, who fired two more shots at him. The first of these shots tore a hole in the leg of Ziegler's shorts. The next shot hit Ziegler in the abdomen. Ziegler fell to the ground, saying, "I've been shot. I've been shot." Appellant got back into his car and drove away quickly. None of the many witnesses heard any argument or verbal confrontation between appellant and Ziegler before the murder. Ziegler died as a result of these gun shots.

Appellant drove to the Los Angeles apartment of Erika Walthius. Two days later, on September 29, she called an investigating detective to report that appellant had overdosed on a bottle of pills. Appellant was taken to a hospital and, after his release the next day, taken into custody.

After his arrest, appellant gave a lengthy interview to Detective Billy Hester. He told Hester that he did not go to Ziegler's work place with the intention of killing him. Instead, appellant said he planned to tell Ziegler that he was done with their rivalry and was going to let Ziegler have Napoli. After appellant revved his engine, Ziegler "ran out" of his shop. Appellant thought Ziegler was carrying a ball peen hammer in his hand. The first two shots appellant fired were, he said, warning shots. He fired the final shot because Ziegler wouldn't stop running toward him. Appellant said he was afraid Ziegler was going to attack him and claimed that Ziegler would have killed him if he hadn't shot first.

4

During the interview, appellant altered his version of the events several times. He first described Ziegler as running toward his car; he later said that Ziegler was walking fast. Although appellant at first said Ziegler was carrying a ball peen hammer in his hand, he later said the hammer was in Ziegler's waistband and then that he wasn't sure whether Ziegler was carrying anything at all. Appellant also changed his story about the location of his gun in his car. In one version of events, the gun was on the passenger seat, in another it was inside the center console. The clip or magazine was alternatively loaded in the gun or stored separately on the seat, under a clothing bag.

In his testimony at trial, appellant denied ever hitting or threatening to hit Napoli. He described each of their fights as mutual and cast Napoli as the instigator. Napoli told appellant that Ziegler wanted to kill him, so he started taking his gun with him everywhere he went. He kept the gun in a secret compartment in the driver's side door of his car. Appellant was also worried Napoli and Ziegler would turn him in to the police. On September 27, he asked Napoli to meet him. He decided to talk to Ziegler because Napoli wouldn't see him. Appellant was planning to tell Ziegler that he wanted Ziegler and Napoli both to stay out of his life. He did not plan to kill Ziegler. Once he was at Ziegler's workplace, however, he thought Ziegler was charging at him with a hammer in his hand Appellant grabbed his gun from the secret compartment and pointed it at Ziegler. When Ziegler kept coming, appellant got scared and fired the gun until Ziegler stopped moving.

*Discussion*

*Prosecution's Use of the Word Murder*

Appellant contends the trial court erred when it denied his motion to limit the prosecutor's use of the word "murder." He contends the prosecutor's frequent use of "murder," rather than a more neutral term such as "homicide" or "shooting," amounted to prosecutorial "error" and improper vouching because it informed the jury that the prosecutor personally believed the killing was murder and not manslaughter or a killing in self defense.

5

A prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and when it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.  (*People v. Strickland* (1974) 11 Cal.3d 946, 955.)  "Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 (*Darden*), quoting *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 (*Donnelly*).)"  (*People v. Rundle* (2008) 43 Cal.4th 76, 157, disapproved on other grounds, *People v. Doolin* (2008) 45 Cal.4th 390, 421.)

Improper vouching occurs when the prosecutor seeks to bolster his or her case " ' "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it."  [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." ' (*People v. Bonilla* (2007) 41 Cal.4th 313, 336 . . . ; see *People v. Zombrano* (2007) 41 Cal.4th 1082, 1167. . . .)"  (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.)  While a prosecutor may comment on the credibility of witnesses, those comments must be "based on facts contained in the record, and any reasonable inferences that can be drawn from them . . . ."  (*People v. Martinez* (2010) 47 Cal.4th 911, 958.)  The prosecutor may not vouch for a witness' credibility "based on personal belief or by referring to evidence outside the record."  (*Id.*)

There was no error.  Although the prosecutor used the word "murder" about 10 times in his opening statement, and often in the questions he asked witnesses, this did not amount to improper vouching or other misconduct.  Murder is the charged offense.  The prosecutor had no obligation to obscure that fact.  His use of the term did not sensationalize the facts of the crime or unfairly appeal to the jury's passions or prejudices,

as might have occurred had he referred to the killing as a "slaughter," or "massacre." He did urge the jury to base its decision on facts not presented at trial or refer to appellant by an insulting nickname. As a result, *Stumbo v. Seabold* (6th Cir. 1983) 704 F.2d 910, cited by appellant, has no application here.

*Evidence of Prior Convictions*

*and Uncharged Misconduct*

Appellant contends the trial court erred in admitting evidence of his nine prior felony convictions and his uncharged misconduct in using and selling methamphetamine and in abusing Napoli. He contends the prior convictions were all over 10 years old and were not relevant to his credibility. Additionally, he contends the evidence was unfairly prejudicial because it served only to demonstrate his criminal disposition. (Evid. Code, § 1101, subd. (b).) Appellant also contends the evidence should have been excluded under Evidence Code section 352. We are not persuaded.

Only relevant evidence is admissible. (Evid. Code, § 210, 350.) The trial court has wide discretion to decide whether evidence is relevant, although it has no discretion to admit irrelevant evidence. (*People v. Alexander* (2010) 49 Cal.4th 846, 904.) Similarly, the trial court has wide discretion to weigh the prejudicial effect of proffered evidence against it probative value. (*People v. Valencia* (2008) 43 Cal.4th 268, 286.) Its determination of relevance or probity " 'will not be overturned on appeal in the absence of an abuse of that discretion.' " (*Id.*, quoting *People v. Cooper* (1991) 53 Cal.3d 771, 816.)

"Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) Evidence that a person committed a crime, civil wrong, or other act may be admitted, however, not to prove a person's predisposition to commit such an act, but rather to prove some other material fact, such as that person's intent or identity. (*Id.*, § 1101, subd. (b).)" (*People v. Harris* (2013) 57 Cal.4th 804, 841.) "Like other circumstantial evidence, admissibility depends on the materiality of the fact sought to be proved, the tendency of the prior crime to prove

7

the material fact, and existence *vel non* of some other rule requiring exclusion." (*People v. Roldan* (2005) 35 Cal.4th 646, 705, disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.) Specifically, "the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.)" (*People v. Jones* (2012) 54 Cal.4th 1, 50.) "We review the trial court's decision whether to admit evidence, including evidence of the commission of other crimes, for abuse of discretion. (See *People v. Jones* (2011) 51 Cal.4th 346, 371.)" (*People v. Harris, supra,* 57 Cal.4th at p. 841.)

Here, the trial court admitted evidence that appellant had one prior conviction in California for evading a peace officer, (Veh. Code, § 2800.2, subd. (a)), and eight prior felony convictions from Georgia: three for theft offenses, two for possession of a controlled substance and three for first degree forgery. Appellant's Georgia convictions occurred in 1995 and 1998; his prior California conviction occurred in 1999. Appellant contends the evidence of his prior convictions was more prejudicial than probative and that his prior crimes were not relevant to prove intent, motive, common plan or any other material fact. (Evid. Code, § 1101, subd. (b).) We disagree.

First, appellant was charged in count 2 with being a felon in possession of a firearm. Each of these prior felony convictions was an element of that offense. Second, appellant's prior convictions were relevant to impeach his testimony. (Evid. Code, § 788; *People v. Harris* (2005) 37 Cal.4th 310, 337 [possession of drugs for sale is conduct involving moral turpitude]; *People v. Dewey* (1996) 42 Cal.App.4th 216, 221-222 [violation of section 2800.2 "evinces a general readiness to do evil[,]"]; *People v. Cadogan* (2009) 173 Cal.App.4th 1502, 1514 [forgery and theft crimes of moral turpitude].) While the convictions were between 14 and 18 years old by the time of appellant's trial, the trial court did not abuse its discretion when it found that they retained probative value. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 205 [7 to 10 years]; *People v. Ewoldt* (1994) 7 Cal.4th 380, 408 [12 years].) As appellant's own testimony

8

demonstrated, he spent the intervening years engaging in the same misconduct of selling methamphetamine and possessing firearms.

Nor did the trial court abuse its discretion when it admitted evidence of appellant's uncharged misconduct. Appellant became acquainted with both the victim and Paula Napoli because he was their methamphetamine dealer. His intimate relationship with Napoli eventually became physically and emotionally abusive. When Napoli also started seeing Ziegler, whom appellant already disliked, appellant became jealous and threatening. This was the context in which Ziegler's murder occurred. Appellant claimed at trial that he did not intend to shoot Ziegler; he fired in self-defense because Ziegler was charging at appellant's car and appeared to armed with a hammer or some other weapon. Evidence of appellant's long-standing enmity toward Ziegler, the threats he made to Ziegler and Napoli, and his violent and controlling behavior toward Napoli was all relevant to prove appellant's intent and motive. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15 (probative value of other crimes evidence "on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus.").)

Finally, the trial court did not abuse its discretion when it concluded the evidence of appellant's uncharged crimes was more probative of his intent and motive, than it was unduly prejudicial. (Evid. Code, § 352.) Our Supreme Court recently summarized the applicable principles: " 'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' (*People v. Waidla* (2000) 22 Cal.4th 690, 724 . . . .) ' "The prejudice which . . . Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statue uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' (*People v. Zapien* (1993) 4 Cal.4th 929, 958 . . .; accord, *People v. Doolin* (2009) 45 Cal.4th 390, 439. (*Doolin*).) The potential for such prejudice is 'decreased' when testimony describing the defendant's uncharged acts is 'no stronger and no more

9

inflammatory than the testimony concerning the charged offenses.' (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)" (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.)

Here, the jury heard evidence that appellant was jealous of Napoli and tried to prevent her from seeing Ziegler. When that failed, appellant was verbally and physically violent toward Napoli. He also sent threatening text messages to both Napoli and Ziegler. None of this evidence was stronger or more inflammatory than the evidence that appellant drove to Ziegler's workplace with a loaded gun which he used to shoot Ziegler as the unarmed Ziegler walked toward appellant's car. The trial court did not abuse its discretion when it concluded the probative value of appellant's prior, uncharged crimes was not substantially outweighed by the danger this evidence would unduly prejudice the jury. (*People v. Memro* (1995) 11 Cal.4th 786, 865.)

### *Instructional Error*

1.  CALCRIM No. 375. The trial court instructed the jury, in terms of CALCRIM No. 375, "The People presented evidence that the defendant committed other offenses that were not charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the offenses . . . . [¶] . . . [¶] If you decide that the defendant committed the offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant acted with the Intent to kill in this case; or [¶] The defendant had a motive to commit the offenses alleged in the this case; or [¶] The defendant had a plan to commit the offenses alleged in this case. [¶] Do not consider this evidence for any other purpose except for the limited purpose of Intent to kill, Motive, and Plan. [¶] If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Premeditated, willfull, deliberate Murder. The People must still prove every charge beyond a reasonable doubt." (CALCRIM No. 375.)

Appellant contends the trial court erred because the instruction allowed the jury to consider his felony convictions in determining whether he acted with intent to kill,

had a motive or had a plan to kill. He concedes that he did not object to the instruction, or request any clarification of it, at trial. As a consequence, appellate review of the issue has been forfeited, unless an error by the trial court affected appellant's substantial rights. (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.) Generally, a party " 'may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Hart* (1999) 20 Cal.4th 564, 622.)

We review de novo the question of whether the instruction at issue correctly states the law. (*People v. Posey* (2004) 32 Cal4.th 193, 218.) In doing so, we view the instruction as a whole to determine whether there is any reasonable likelihood the language of the instruction "would confuse the jury or relieve the prosecution of any of its burden of proof." (*People v. Catlin* (2001) 26 Cal.4th 81, 151.)

Even if appellant had preserved the issue for review, we would reject it because there is no reasonable likelihood the jury would have been confused or misled by CALCRIM No. 375. The instruction states that it applies to "uncharged offenses," not prior felony convictions.

2. Instructions Regarding Self-Defense. The trial court instructed the jury on self-defense and imperfect self-defense with CALCRIM No. 505 and CALCRIM No. 571. Both pattern instructions were modified at the request of the prosecutor and over appellant's objections. Specifically, after listing the elements of lawful self-defense, the trial court informed the jury that appellant must have believed he was in imminent danger. This belief "must have been reasonable and [appellant] must have acted only because of that belief." After explaining that a defendant is not required to retreat, the trial court modified the pattern instruction by adding, "However, this principle is not available, and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of

11

force, attack or pursuit." The trial court inserted this same paragraph into CALCRIM No. 571, the pattern instruction on imperfect self-defense.[2]

With respect to the requirement that the defendant believe he was in imminent danger, the trial court instructed the jury, " 'Imminent danger' as used in these instructions, means that the danger must have existed or appeared to the defendant to have existed at the very time the fatal shot was fired. In other words, the danger must appear to the defendant as immediate and present, and not prospective or even in the near future. An imminent danger is one that, from appearances, must be instantly dealt with."

Appellant contends the special instruction and modifications to CALCRIM No. 505 and No. 571 improperly limited his right of self-defense because they made the defenses unavailable if the jury found he did not believe he was in imminent danger at the very moment he fired the fatal shot; if he had multiple motives for acting in self defense; and if he created the circumstances necessitating his use of force by driving to Ziegler's workplace during normal business hours. There was no error.

We note initially that appellant did not object to or request any amplification of the imminent danger instruction in the trial court. His failure to do so forfeits appellate review of the instruction. (*People v. Johnson* (1993) 6 Cal.4th 1, 52; *People v. Hamilton* (1988) 46 Cal.3d 123, 146.) Appellant's trial counsel also failed to object on federal constitutional grounds to any of the self-defense or imperfect self-defense instructions. Review of those issues has also been forfeited. (*People v. Hinton* (1006) 37 Cal.4th 839, 897.) Had the contentions been preserved for appellate review, we would reject them.

---

[2] The trial court also instructed the jury on mutual combat and provocation. Thus, the jury was instructed, in terms of CALJIC No. 3471 that, "A person who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; AND [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight." The jury was further instructed, in terms of CALJIC No. 3472, that, "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

First, the trial court's special instruction regarding imminent danger was a correct statement of the law. As our Supreme court has emphasized, "Fear of future harm – no matter how great the fear and no matter how great the likelihood of the harm – will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with*." ' . . . . Put simply, the trier of fact must find an *actual* fear of an *imminent* harm." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) The instruction did not limit the jury's consideration only to the moment at which appellant fired the third and fatal shot. Instead, it required the jury to determine whether the danger appeared "to the defendant as immediate and present and not prospective or even in the near future."

Second, the instruction on self-defense, CALCRIM No. 505, correctly informed the jury that, to find appellant acted in self-defense, "Defendant's belief [that he was in imminent danger of being killed or suffering great bodily injury] must have been reasonable and he must have acted only because of that belief." (CALCRIM No. 505.) This portion of the instruction is based on section 198 which provides, "A bare fear of the commission of [certain felonies], to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." Appellant contends the phrase "such fears alone" precludes self-defense where the defendant has a "purely personal, subjective 'bare fear' of death or great bodily injury." It does not, he contends, preclude the defense where "the party killing" has more than one motive, as long as one of the motives is a reasonable fear that a felony will occur.

Like other courts considering the issue, we reject appellant's interpretation of section 198. Section 198 requires that a person who kills in self-defense do so because that person reasonably believes himself or herself to be in imminent danger of death or great bodily injury. (See, e.g., *People v. Flannel* (1979) 25 Cal3d 668, 675.) "The party killing is not precluded from feeling anger or other emotions save and except fear;

13

however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense. But if the only causation of the killing was the reasonable fear that there was imminent danger of death or great bodily injury, then the use of deadly force in self-defense is proper, regardless of what other emotions the party who kills may have been feeling but not acting upon." (*People v. Trevino* (1988) 200 Cal.App.3d 874, 879; see also *People v. Shade* (1986) 185 Cal.App.3d 711, 716.)

Finally, the trial court correctly instructed the jury that self-defense and imperfect self-defense are not available "and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force, attack or pursuit."   Our Supreme Court has described this principle as "well established[.]" (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.)  Self-defense and imperfect self-defense "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created the circumstances under which his adversary's attack or pursuit is legally justified." (*Id.*; see also *People v. Enraca* (2012) 53 Cal.4th 735, 761-762; *People v. Seaton* (2001) 26 Cal.4th 598, 664 (imperfect self- defense not available where "defendant's testimony showed him to be the initial aggressor and the victim's response legally justified. . . .").)

The instruction did not, as appellant contends, require the jury to reject his defense solely because appellant drove to Ziegler's workplace.  Instead, the jury was instructed to reject appellant's claims of self-defense and imperfect self-defense if it found that he engaged in "unlawful or wrongful conduct" that created circumstances under which Ziegler was justified in attacking or using force against appellant. (See, e.g., *People v. Frandsen* (2011) 196 Cal.App.4th 266, 273 ("Only when the victim resorts to *unlawful* force does the defendant-aggressor regain the right of self-defense.").)  If the jury found any one of those factors to be missing – e.g., if appellant did <u>not</u> behave unlawfully or wrongfully or if Ziegler did <u>not</u> attack or use force against appellant – the instruction would not apply.

14

3. CALCRIM No. 361. Appellant contends the trial court erred in instructing the jury, in terms of CALCRIM No. 361, because the instruction required the jury to view his testimony differently from that of other witnesses and because the instruction was not supported by the evidence. The pattern instruction states: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure." (CALCRIM No. 361.)

This instruction, if supported by substantial evidence, "does not violate a defendant's privilege against self-incrimination, deny him the presumption of innocence, nor violate due process. (*People v. Saddler* (1979) 24 Cal.3d 671, 678.)" (*People v. Sanchez* (1994) 24 Cal.App.4th 1012, 1029.) It is error, however, to give the instruction when the evidence does not support it. (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469.) The instruction may properly be given only when there are "facts or evidence in the prosecution's case within [the defendant's] knowledge which he did not explain or deny." (*People v. Saddler, supra,* 24 Cal.3d at p. 682.)

We conclude the trial court erred in instructing the jury with CALCRIM No. 361 because the instruction was not supported by substantial evidence. Appellant's testimony on cross-examination was evasive and implausible, but it was also comprehensive. He tendered an explanation for "everything." Our review of the record does not disclose instances in which appellant failed to explain or deny his statements or conduct, even though there are many instances in which those explanations were not credible.

The example relied on by respondent does not support the instruction. Napoli broke up with appellant after Ziegler told her that he had seen a video of appellant having sex with another woman. Appellant sent Napoli a text message berating her for believing Ziegler when Ziegler had "no proof" of the video. He testified on cross-

15

examination that the video existed, and Ziegler had seen it, but Ziegler had no proof of it because appellant retained the only copy of the video. This testimony demonstrates that appellant lied to Napoli, and split hairs on cross-examination, but it does not show a failure to explain or deny incriminating evidence.

The trial court's error in giving this instruction was, however, harmless because it is not reasonably probable a result more favorable to appellant would have been reached had the instruction been omitted. (*People v. Lamer, supra,* 110 Cal.App.4th at pp. 1471-1472.) First, there is no reason to conclude the jury even applied CALCRIM No. 361, since it was also instructed, "Some of these instructions may not apply, depending on your findings about the facts of the case. . . . . After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." Second, appellant's testimony was contradicted by the eyewitnesses and impeached in many respects by his own text messages. Given the overwhelming evidence against him, it is not reasonably probable that a single instruction, permitting but not requiring the jury to consider evidence, influenced its findings in any way.

*Ineffective Assistance of Counsel*

Appellant contends his trial counsel was ineffective because counsel's failure to object forfeited appellate review of these asserted instructional errors. To prevail on this claim, appellant must demonstrate that the representation he received from trial counsel fell below an objective standard of reasonableness, according to prevailing professional norms, and that there is a reasonable probability the result of the trial would have been different but for counsel's unprofessional errors. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Farnam* (2002) 28 Cal.4th 107, 148.) Appellant has made no such showing. First, the omitted objections would properly have been denied. Counsel is not ineffective for failing to make futile objections. (*People v. Weaver* (2001) 26 Cal.4th 876, 931.) In addition, appellant has not demonstrated that he was prejudiced by counsel's asserted unprofessional errors. The evidence against appellant – threatening text messages, eyewitnesses to the broad-daylight shooting of his unarmed nemesis, and appellant's confession – was truly overwhelming. There is no

16

reasonable probability that variations in the definition of "imminent danger" or the initial aggressor rule would have yielded a more favorable verdict.

*Cumulative Error*

Appellant's final contention is that the cumulative effect the errors he has identified resulted in the denial of a fair trial. (*Taylor v. Kentucky* (1978) 436 U.S. 478, 487-488; *People v. Hill* (1998) 17 Cal.4th 800, 844-848.) We reject this contention because, for the reasons already stated, we have no prejudicial error to cumulate. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1094.)

*Conclusion*

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

YEGAN, J.

We concur:

GILBERT, P.J.

PERREN, J.

17

Jeffrey G. Bennett, Judge

Superior Court County of Ventura

_____


Susan K. Shaler, under appointment by the Court of Appeal, for Deendant and Appellant.


Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Zee Rodriguez, Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.